# TENNESSEE AND COOSA RAILROAD COMPANY vs. MOORE.

[MANDAMUS BY RAILROAD COMPANY AGAINST GOVERNOR.]

1. *Against whom mandamus lies.*—A *mandamus* lies against the governor of the State, as well as any other public functionary, to compel the performance of a purely ministerial duty enjoined by statute.

2. *And when.*—Where a sum of money is loaned by act of the legislature to a railroad company, on its complying with certain terms and conditions in said act prescribed; and the governor is required, on the performance of these conditions by the company, to accept its bond for the faithful application and repayment of the money, and to draw his warrant in its favor, on the custodian of the fund, for the sum thus loaned,—a *mandamus* will lie to compel the performance by the governor of this ministerial duty, since an action for damages, if it could be maintained, would not afford adequate and complete redress.

3. *Constitutionality of statute loaning two and three per cent. funds to railroad companies, and imposing additional restrictions on loan authorized by former statute.*—The act of February 17, 1854, " to aid the Tennessee and Coosa railroad," (Session Acts 1853–4, p. 280,) having been accepted and acted on by the said railroad company, by the completion of portions of its road, and the letting out of contracts for the completion of the residue within the time required by said act, it was not competent for the legislature, by the subsequent act of February 24, 1860, (Session Acts 1859–60, p. 110,) to impose additional limitations on the loan authorized by the former act; nor can the latter act operate as a revocation of the authority conferred on the governor by the former; consequently, said railroad company is entitled to receive from the public treasury the sums loaned by the former act, on its performance of the conditions therein specified, without a compliance with the additional requisitions of the latter act.

4. *Construction of act of February 17, 1854, " to aid the Tennessee and*

*Coosa railroad.*"—The act of February 17, 1854, entitled "An act to aid the Tennessee and Coosa railroad," (Sess. Acts 1853–4, p. 280,) is not void for uncertainty ; the portion of the two and three per cent. funds therein specified, is advanced to the railroad company as a loan, and not as a gift; and the company is bound, in the absence of subsequent legislation as to the terms of payment, to repay the sum so loaned, in cash, within ten years, without interest for four years, and with interest at five per cent. *per annum* after four years.

5. *Remandment of cause on reversal.*—On the reversal of a judgment of the circuit court, rendered on demurrer to evidence, or on an agreed state of facts, the cause will be remanded.

APPEAL from the Circuit Court of Dallas.
Tried before the Hon. NAT. COOK..

THIS was an application by the appellant, a corporation chartered by act of the legislature of this State, approved on the 16th January, 1844, (Session Acts 1843–4, p. 170,) for a rule *nisi* against the governor of the State, to show cause why a peremptory *mandamus* should not be issued, commanding him to draw his warrant on the comptroller or treasurer of the State, in favor of the petitioner, for a certain portion of the two and three per cent. funds, claimed by the petitioner under an act of the legislature hereinafter set out, and to accept from the petitioner a certain bond and mortgage tendered under the provisions of the same act. The act under which the petitioner claimed the money, and the subsequent act under which the governor justified his refusal to draw his warrant in its favor, are in the following words:

"*An Act to aid the Tennessee and Coosa Railroad.* Approved February 17, 1854.

"SECTION 1. *Be it enacted by the senate and house of representatives of the State of Alabama, in general assembly convened,* That two hundred and fifty thousand dollars of the three per cent. fund, and one-half of the unappropriated part of the two per cent. fund, be, and the same are hereby, loaned or advanced to the Tennessee and Coosa Railroad Company, upon the terms, limitations and restrictions hereinafter named—that is to say, that when said company

shall have completed, ready for laying down the iron rails, one-fifth part of the grading and local work of said road, and shall produce to the governor of the State satisfactory evidence thereof, and that the same has been completed in a substantial, permanent and durable manner, then the said company shall be entitled to receive one-fifth of two hundred and fifty thousand dollars of the three per cent. fund and one-fifth of the two per cent. fund hereby appropriated, and so in proportion of every fifth part of said road so graded and prepared, until the whole road is completed, upon their executing in due form a bond or bonds, payable to the governor of the State of Alabama and his successors in office, for the payment in manner as hereinafter provided [of] the sum or sums received under this act, and that the same shall be honestly and faithfully applied to the construction of said road, and that said road shall be completed within ten years from the passage of this act, [and] that if repayment be made in cash, it shall be made within ten years, with interest at five per cent. *per annum* after four years; which bonds shall be secured to the entire and full satisfaction of the governor, by personal security, mortgage, or otherwise, as he may require; and upon execution and delivery to the governor [of] the bond or bonds of the company as herein required, he shall issue his warrant on the treasurer, bank-commissioner, or other officer or person having the custody of said two and three per cent. funds, or any portion of them, for the sum or sums to which said company may be entitled under this act, and the same shall be paid to said company by such officer or person having the custody of the funds as aforesaid.

"SECTION 2. *Be it further enacted,* That the funds hereby appropriated shall not be liable for, or applied to, the payment of any debt created before their reception by the company.

"SECTION 3. *Be it further enacted,* That the funds received under this act shall be applied to the construction of said road; and if said fund so received shall be misapplied, the president and directors, and other officers of said company who sanction or assent in such misapplica-

tion, shall be deemed guilty of a misdemeanor, and, upon conviction thereof upon indictment, shall be punished by fine and imprisonment, one or both, at the discretion of the jury trying the same; and shall, moreover, be personally liable in their private property to the State for the amount of the fund so misapplied. *And provided further*, that nothing herein contained shall suspend or take precedence of any appropriation heretofore made to any railroad or plank-road in this State; but such appropriation shall be first provided for, before any money or moneys shall be paid under this act.

"SECTION 4. *Be it further enacted*, That if said company does not grade one-fifth of said road in two years, then said road shall not be entitled to the provisions of this act.

"SECTION 5. *And be it further enacted*, That when one-fifth part of said road is fully completed, the said company shall execute a mortgage deed upon the part so finished, to the satisfaction of the governor, before receiving the amount appropriated by this act for the next fifth part; and so on successively upon every fifth part as completed."—Session Acts of 1853-4, pp. 280–82.

"*An Act to loan a part of the three per cent. fund to the Union Town and Jackson, Selma and Gulf, and Cahaba, Marion and Greensboro' Railroad Companies.* Approved February 24, 1860.

"SECTION 1. *Be it enacted by the senate and house of representatives of the State of Alabama, in general assembly convened*, That of the sum of two hundred and fifty thousand dollars of the three per cent. fund, loaned to the Tennessee and Coosa Railroad Company by an act approved 17th February, 1854, when the same shall have become due by the terms of said act, and shall have been paid, there shall be loaned, on the terms and conditions hereinafter provided, to the Union Town and Jackson Railroad Company the sum of one hundred and fifty thousand dollars, and to the Selma and Gulf Railroad Company the sum of one hundred thousand dollars.

"SECTION 2. *Be it further enacted*, That said loans shall be made for ten years after the money thereon shall be

received by said railroad companies, and shall bear interest at the rate of five per cent. *per annum* after four years.

"SECTION 3. *Be it further enacted,* That before the money on said loans shall be obtained by said railroad companies, they shall each be required to execute a bond, in double the amount of the loan obtained by them respectively, conditioned for the faithful repayment of the loan so obtained by each, with the interest thereon, and shall give a mortgage on each of said roads, and all its fixtures and franchises, and shall, in addition, give such personal security as the governor shall deem necessary and proper to secure the faithful and punctual repayment of said loans, together with the interest thereon provided for.

"SECTION 4. *Be it further enacted,* That there shall be loaned to the Cahaba, Marion and Greensboro' Railroad Company, out of the first interest accruing on the said loan to the Tennessee and Coosa Railroad Company, the sum of forty thousand dollars, upon the same terms, conditions and restrictions as provided in relation to the loans to the other railroad companies named in this act.

"SECTION 5. *Whereas* doubts have been suggested as to the true meaning and intent of the act referred to in the first section of this act, authorizing a loan to the Tennessee and Coosa Railroad Company, *be it, and it is hereby enacted,* That the true intent and meaning of said act shall be construed to be, that the said Tennessee and Coosa Railroad Company are bound and shall be bound by the terms of said act to pay the interest on said loan, and repay the principal in cash at the maturing of the loan authorized in and by said act; and the said railroad company shall not be entitled to receive any portion of the money set apart for said loan by the bill entitled 'An Act to loan and appropriate the three per cent. fund and its interest', (which has passed the house of representatives, and is now pending in the senate,) if the said bill should become an act, until said company shall deliver to the governor, to be filed in the office of the comptroller, a declaration and agreement, setting forth that the construction of said act as declared in and by this section is and shall be the true and rightful construction of the

same, and that the said company is and shall be bound thereby, and that no advantage shall be taken of any construction of which said act might be susceptible, contrary to the true intent and meaning thereof as declared in and by this section; and in taking the bond required of said company under the provisions of this act, for the security of the principal and interest of the amount to be loaned to said company, proper provisions and conditions shall be inserted in said bond for the payment of the interest and principal of the said loan in cash, in accordance with the construction of said act as defined and declared in and by this section; and the declaration and agreement hereinabove required by the said company shall be made in due form by the board of directors of said company, and shall be ratified by resolution of the stockholders of the company in convention, to be attested by the president and secretary of the company under the corporate seal of the company."—Session Acts 1859–60, pp. 110–11.

The act "to loan and appropriate the three per cent. fund and its interest," referred to in the 5th section of the act last above copied as then pending in the senate, by its 1st section, declared the amount of the three per cent. fund, principal and interest, to be $858,498; "of which sum," it also declared, "$195,363 is the balance due as a loan to the Tennessee and Coosa Railroad Company, under an act approved February 17, 1854, which said loan is ratified as prescribed in said act"; and, by its subsequent sections, loaned and appropriated the residue of said fund to other railroad companies therein specified. Session Acts 1859–60, p. 54. The act of 1854, above set out, was amended by a subsequent act, approved 19th December, 1855, by striking out the words "fully completed", where they occur in the 5th section, and inserting in their stead the words "completed as provided for in the first section of this act.—Sess. Acts 1855–6, p. 240.

The petition alleged, that the petitioner assented to the grant made by the said act of 1854 soon after its passage, and proceeded to grade its road as therein required, and

let out contracts for the completion of the entire road; that, in February, 1859, having completed one-fifth part of its road, and produced satisfactory evidence thereof to the governor, and tendered the prescribed bond, as required by the said acts of 1854 and 1855, it drew from the State treasury, on the warrant of the governor, the sum of $50,000; that on the completion of another fifth part of its road, in October, 1859, and its full compliance with all the requisitions of said act of 1854, it received in like manner an additional $50,000; that a few days after the passage of the act of February 18, 1860, above referred to, it received in like manner the residue of the sum thereby declared to be due to it; that on the 17th April, 1860, having completed another fifth of its road, it produced to the governor satisfactory evidence of that fact, and tendered to him another bond and mortgage, as required by said act of 1854; and that the governor refused to receive said bond and mortgage, and refused to draw his warrant in favor of the petitioner as required by said act of 1854. The acts of 1854 and 1855, and the act of February 18, 1860, were made parts of the petition; and the prayer was for a rule *nisi*, and for general relief.

The governor endorsed on the petition the following words: "I, Andrew B. Moore, governor of the State of Alabama, being willing and desirous that the legal question involved in the controversy between the Tennessee and Coosa Railroad Company and the State of Alabama, as shown by the within petition, should be decided without unnecessary delay, do hereby admit the facts stated in said petition, and agree, so far as I can legally do so, that the proceedings for a *mandamus* may be instituted in the circuit court of Dallas county, at the present term thereof; and I hereby waive the necessity of the ordinary rule to show cause, and agree that the cause may be proceeded with as though the rule had been duly issued and served on me."

On the hearing of the application, the petitioner read to the court the petition and acts therein referred to; and the respondent read the said act of February 24th, 1860, above copied, with the terms and conditions of

which, it was admitted, the petitioner had not complied. The circuit court thereupon overruled the application, and dismissed the petition; to which the petitioner excepted, and which is now assigned as error.

GOLDTHWAITE, RICE & SEMPLE, and ALEX. & JNO. WHITE, for the appellant.—1. The act of 1854 grants a certain sum of money to the appellant, on the performance of certain conditions therein expressed, not as a gift, but by way of loan. It evidently contemplated the probability of future legislation as to the repayment of this money; authorizing such repayment to be made in the bonds of the company, or in some other mode than cash. But, in the event that no such legislation should be had, then the repayment was to be made in cash, within ten years; without interest for four years, and with interest at five per cent. after that time.

2. This act, and its acceptance by the railroad company, operated as a contract between the State and the company; and it was not in the power of the legislature, by subsequent legislation, without the consent of the company, to impair its force and obligation, by the imposition of additional limitations or restrictions on the loan. The charter of the company imposed no obligation on it to complete all, or any part of its road within any specified time; but the act of 1854, after its acceptance by the company, bound it to grade one-fifth of its road within two years. On the faith of this act, the company has completed a portion of its road, and has let out contracts for the completion of the residue within the specified time. That the case presents all the elements of a contract, which, under the provisions of the constitution, cannot be impaired by subsequent legislation, see Atwater v. Woodbridge, 6 Conn. 223, 228; Fletcher v. Peck, 6 Cranch, 87; New Jersey v. Wilson, 7 Cranch, 164; Terrett v. Taylor, 9 Cranch, 43; Dartmouth College v. Woodward, 4 Wheaton, 656; 15 B. Monroe, 642; 27 Miss. 517; Green v. Biddle, 8 Wheaton, 1–84; 10 Geo. 190; Story on Constitution, vol. 2, § 1385.

3. The act of 1860, under which the governor's refusal

Tennessee and Coosa Railroad Co. v. Moore.

to draw his warrant is justified, cannot operate simply as a revocation of the authority conferred on him by the act of 1854. That would be to allow the State to do indirectly what, under the authorities above cited, it could not do directly. The act of 1860 was evidently passed under the impression that the legislature had the authority to do what that act attempts to do—to impose additional limitations and restrictions on the loan authorized by the former act. An express repealing clause, in an unconstitutional statute, has no effect on existing laws; an implied repealing clause can certainly have no greater efficacy. The warrant to be drawn by the governor, under the act of 1854, must be either a right—an essential part of the contract—or a remedy. It could not have been intended as a remedy, for that only follows a breach. If it be a part of the contract, entering into the mode of payment, the legislature could not revoke the authority of the governor to issue it, without impairing the obligation of the contract. Moreover, the authority of the governor, since the acceptance of the act by the company, is in the nature of a power coupled with an interest, and is irrevocable.—Hodgson v. Anderson, 3 Barn. & Cr. 842; Creager v. Link, 7 Maryland, 267.

4. *Mandamus* lies whenever there is no other specific legal remedy for the enforcement of a specific legal right. It is evident that, in this case, an action at law, if it could be maintained, would not afford adequate redress for the injury suffered by the appellant in being deprived of the use of the funds to which it is entitled. The propriety of issuing a *mandamus* is to be determined, not by the office of the person to whom the writ is directed, but by the nature of the act to be done; and in the performance of duties purely ministerial, as in this case, the governor is amenable to that process equally with any other public functionary. In support of these propositions, see Marbury v. Madison, 1 Cranch, 137; Kendall v. United States, 12 Peters, 614; Etheridge v. Hall, 7 Porter, 54; *Ex parte* Pickett, 24 Ala. 94; *Ex parte* Jones, 1 Ala. 15; Riggs v. Pfister, 21 Ala. 469; *Ex parte* Cole, 28 Ala. 50; 17 Ala. 527; Baker v. Johnson, 41 Maine, 15; People v.

Edmonds, 19 Barbour, 468; 2 Binney, 275; 15 East, 117; 14 East, 261; 1 Term, 396; 10 Wendell, 396; 5 Watts & S. 403–22; 19 Johns. 259; 9 Maryland, 83; 28 Miss. 38; 3 Burr. 1266; 23 Missouri, 353.

JOHN T. MORGAN, contra, argued the case orally at the bar, but submitted no brief or written argument.

R. W. WALKER, J.—In support of the action of the circuit court, three distinct propositions have been asserted and argued before us : 1st, that the court has not the power, in any case, to issue a mandamus to the governor of the State; 2d, that a mandamus does not lie in this case, even if the company is entitled to the money claimed, because the right to the issuance of a warrant is not a specific legal right, for which there is no adequate legal remedy; and, 3d, that the failure of the company to comply with the requisitions of the act of February 24th, 1860, (Acts '59–60, p. 110,) justified the governor in refusing to draw his warrant.

1. To the first proposition we cannot assent. Chief-Justice Marshall declared, and we concur in the remark, that "it is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined."—Marbury v. Madison, 1 Cranch, 170. By the constitution of this State, the powers of government are divided and distributed among three departments; the legislative, the executive, and the judicial. The governor, as the head of the second of these departments, is clothed with "the supreme executive power of the State;" and in the discharge of those political functions attached to his office, which depend on the exercise of his own judgment or discretion, his determinations are conclusive. Any attempt on the part of the judiciary to control or direct him in the performance of executive duties, about which he has a discretion, and may exercise his own judgment, would be a manifest usurpation of power. But there is nothing in the nature of his office, which can prevent the legislature from assigning to the

governor the performance of some mere *ministerial* acts, in regard to which he is not clothed with any *discretionary* power, his whole duty being that of simple obedience to the command of the legislature; and when this is done, the governor is to be viewed as merely the ministerial agent of the law; and if he fails or refuses to perform the act required of him, he is amenable to the law; and any person whose rights are dependent on the performance of such act, may have redress by resorting to the appropriate legal remedy.

In Marbury v. Madison, (1 Cranch, 137, 165,) Chief-Justice Marshall, after declaring that the acts of the head of one of the executive departments, in matters resting in executive discretion, can never be examinable by the courts, uses this language: "But, when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law, is amenable to the law for his conduct, and cannot at his discretion sport away the vested rights of others."—See, also, pp. 170–1.

The doctrine that a *mandamus* will lie against one of the executive officers of the government, to enforce the performance of a mere ministerial act, was distinctly affirmed in Kendall v. The United States, 12 Peters, 524, 595, 610, 626, 641. In that case, Mr. Butler, the attorney-general, admitted in his argument, that, "as the ordinary character of an officer's functions would not always determine the true nature of a particular duty imposed by law, if an executive officer, the head of a department, even the president himself, were required by law to perform an act merely ministerial, and necessary to the completion or enjoyment of the rights of individuals, he should be regarded, *quoad hoc*, not as an executive, but as a merely ministerial officer; and therefore liable to be directed and compelled to the performance of the act by *mandamus*, if congress saw fit to confer the jurisdiction."—12 Peters, 595.

The same principle applies to judicial officers, who,

though not answerable for errors of judgment, however plain the mistake, are responsible for any injury which results from their failure to perform a ministerial duty cast upon them by law. In Ferguson v. Earl of Kinnard, (9 Clark & Finn. 279, 290,) Lord Brougham, after stating the first branch of this proposition, added: "But, where the law neither confers judicial power, nor any *discretion* at all, but requires certain things to be done, everybody, whatever be its name, and whatever other functions of a judicial or discretionary nature it may have, is bound to obey; and, with the exception of the legislature and its branches, everybody is liable for the consequences of disobedience." Lord Campbell said in the same case (p. 312): "Where there is a *ministerial* act to be done by persons who, on other occasions, act judicially, the refusal to do the ministerial act is equally actionable as if no judicial functions were, on any occasion, entrusted to them. There seems no reason why the refusal to do a *ministerial* act, by a person who has certain *judicial* functions, should not subject him to an action, in the same manner as he is liable to an action for an act beyond his jurisdiction."—See, also, opinions of Lord Lyndhurst and Lord Cottenham, pp. 280, 306.

All this is but the result of the just and wholesome principle, that no public functionary, whatever his official rank, is above the law, or will be permitted to violate its express command with impunity. While, therefore, it is true that, in regard to many of the duties which belong to his office, the governor has, from the very nature of the authority, a discretion which the courts cannot control; yet, in reference to mere *ministerial* duties imposed upon him by statute, which might have been devolved on another officer if the legislature had seen fit, and on the performance of which some specific private right depends, he may be made amenable to the compulsory process of the proper court by *mandamus*..—Authorities *supra;* State of Ohio v. Chase, 5 Ohio St. R. 528; Citizens v. Wright, 6 Ohio St. R. 318; Pacific R. R. Co. v. Governor, 23 Missouri, 353.

As the case stands upon the petition, and the admission

Tennessee and Coosa Railroad Co. v. Moore.

by the governor of the facts stated in it, everything has been done by the company which is required by the act "to aid the Tennessee and Coosa Railroad," approved February 17, '54, (Acts '53-4, p. 280;) and if we look to that act alone, nothing remains to be done, so far as the governor is concerned, but what is purely *ministerial*—namely, the reception of the bond and mortgage, and the issuance of a warrant. In performing these ministerial duties, the governor does not proceed according to his own judgment or discretion, but in obedience to the peremptory command of the legislature, and as a mere agent of the State, appointed and required by statute to do a particular thing. As the *mandamus* is moved for to enforce the performance of a ministerial act expressly enjoined by statute, the fact that the officer against whom it is sought is governor of the State, is not, of itself, an answer to the application.

2. But the petitioner is not entitled to the writ, unless it appears that there is no other adequate legal remedy for the wrong complained of. And this brings us to the second proposition insisted on, in support of the ruling of the circuit court—namely, that, looking alone to the act of 1854, and conceding that the petitioner has complied with all of its provisions, and is entitled to the money claimed, the right to have a warrant issued by the governor is not a specific legal right, for which the writ of *mandamus* affords the only adequate legal remedy.

The right which the petitioner asserts is, in two aspects, a specific legal right. The act of February 17th, 1854, above referred to, gives to the petitioner, on its performance of the prescribed conditions, the right to the use of a sum of money, on certain terms set forth in the act. This is as much a legal right, as the right to the use of any other property. Again, the act of 1854 imposes as a duty on the governor the issuance of his warrant on the custodian of a specified fund, for the payment of a certain sum of money to the petitioner, on its complying with the requisitions of the statute. The governor being bound by law to perform a duty for the benefit of the company, the latter has a clear legal right to have it performed.

Tennessee and Coosa Railroad Co. v. Moore.

To deprive a party of his remedy by *mandamus*, on the ground that he has a remedy by action, the remedy by action must be adequate to the specific object in view—"framed to effect directly the desired end." It must afford complete satisfaction, "equivalent to specific relief." In matter of Trustees of Williamsburg, 1 Barb. Sup. Ct. R. 34–5; Harwood v. Marshall, 9 Maryland, 83, 98; Kendall v. United States, 12 Peters, 614; Etheridge v. Hall, 7 Porter, 54; *Ex parte* Pickett, 24 Ala. 94; 3 Halst. 206; 2 Dougl. 525; Carroll v. Board of Police, 28 Missouri R. 38, 52.

Without stopping to inquire whether the company could maintain an action for damages against the officer or the State, we find no difficulty in deciding, that any such action would be inadequate to the object in view, and fall far short of affording a complete satisfaction to the petititioner. The great end to be attained by the railroad company is the building of the road; and this was the object which the State had in view in making the loan or advance provided for by the act of 1854. The purpose of the legislature was, to enable the company, by the aid afforded by the act, to complete the work at an earlier period than was required by the charter. One of the conditions of the act of 1854 is, that before any warrant can be issued in favor of the company, it shall give bond, with security satisfactory to the governor, for the completion of the road within ten years from the passage of the act. The petition shows that, before receiving the first payment, the company did give this bond; and that upon the faith of the act of 1854 it has let the entire road to contract. In order to carry on the work, it relies upon obtaining, promptly, as it becomes entitled to them, the sums of money secured to it by that act. The failure to receive the sums loaned or advanced by that act, at the times and in the manner provided, will leave the company without means to meet the obligations which it has incurred to contractors, and will put it out of its power to comply with its undertaking to complete the road within ten years from the passage of the act. It is obvious, therefore, from the very nature of the case, that an

action for damages would be a remedy wholly inadequate to the object in view. Under the rules of law controlling the measure of damages, such an action would not afford complete redress for the injury which the company would sustain, if it should fail to receive promptly, as they fall due, the sums necessary to enable it to proceed without interruption with the construction of the road.—See Kendall v. United States, 12 Peters, 614–15; Carroll v. Board of Police, 28 Missouri R. 38, 52.

It is, perhaps, proper to add, that we do not intend by anything we have said to intimate that the company would have the right to appropriate any part of the money received from the State in a manner inconsistent with the second section of the act of February 17, 1854.

3. We now come to consider the third proposition urged in opposition to the motion for a *mandamus*—that is, that although the company has done everything which it was required to do by the act of 1854, in order to entitle it to the warrant; yet that the governor properly refused to issue it, because the company has not complied with the requisitions of the act of February 24th, 1860, (Acts '59–60, p. 110.)

The question, whether the faiure of the company to comply with the requisitions of the last named act justified the governor in his refusal to draw his warrant in its favor, depends upon the character and legal effect of the act of February 17th, 1854, when considered in connection with the facts stated in the petition, and admitted by the governor. If that act, after its provisions had been accepted and acted on by the company, constituted a contract between the State and the company, the legislature had no right by any subsequent act, without the consent of the company, to change its terms, or impair its obligations.

Although not delegated in express terms by the constitution, the power of the legislature to bind the State by contract is not open to question. It is one of the incidental powers necessary to the proper discharge of the functions of government, and is included in the general grant of "the legislative power of the State," which the

constitution makes to the general assembly. Nor is the legislature limited as to the manner in which it may contract, whether directly by statute, or through agents appointed for the purpose, in the ordinary form of contracts between individuals. Whatever its form, the contract of a State is, like any other contract, binding upon the parties; nor can the people, or their representatives, by any subsequent act of theirs, alter or annul it. When the contract is made, the constitution of the United States acts upon it, and puts it beyond the power of any succeeding legislature to impair its obligation.—2 Story on Const. § 1391; 16 Howard, 369, 416; 11 Peters, 549.

That the act of 1854 is, in the strictest sense of the term, a contract between the State and the railroad company, seems too clear to be disputed. The charter of the company (Acts 1843–4, p. 170) imposed no obligation on it to complete all or any part of the road within any given time. But, by the act of 1854, the legislature proposed to the company, that if it would grade one-fifth of the road within two years from the date of that act, and give bond to complete the entire road in ten years, it should receive on certain specified terms $50,000 of the three per cent. fund, and that on the completion of each succeeding fifth part of the road, and the giving of a like bond, it should receive the same amount. The company accepted this proposition of the legislature, and, in pursuance of it, graded the first fifth part of the road within the time stipulated; has since then graded other portions of the road, and, having given bond and security as required for the completion of the entire road in ten years, has received from the State two payments, of $50,000 each, out of the fund designated by the act. Here are all the elements of a valid and binding contract—the concurrence of intention between two parties competent to contract, one of whom promises something to the other, in consideration of something agreed to be done by the latter. On the part of the State, the obligation is, "*do ut facias;*" on the part of the company, it is "*facio ut des.*"

Undoubtedly, the legislature considered that the com-

Tennessee and Coosa Railroad Co. v. Moore.

pletion of this road within the time specified in the act of 1854 would greatly advance the interests of the State, and that the public benefit thus conferred would be a full equivalent for the use of the money by the company. But it is not necessary to the validity of the contract that the consideration for the promise of the legislature should be one of benefit to the State. It is sufficient if it import damage, or loss, or forbearance of benefit, or any act done or to be done on the part of the company.

The company, then, by accepting the proposition of the legislature, and complying with its terms in the manner shown in the petition, acquired a vested right to the fulfillment of the contract by the State, of which no subsequent legislation could deprive it.

It cannot be seriously contended, that the act of February 24, 1860, does not "impair the obligations" of the prior contract between the State and the company. "It is perfectly clear, that any law which enlarges, abridges, or in any manner changes the intention of the parties resulting from the stipulations in the contract, necessarily impairs it. The manner or degree in which this change is effected, can in no respect influence the conclusion; for, whether the law affect the validity, the construction, or the evidence of the contract, it impairs its obligation, though it may not do so to the same extent in all supposed cases. Any deviation from its terms, by postponing or accelerating the period of performance which it prescribes, *imposing conditions not expressed in the contract*, or dispensing with the performance of those which are a part of the contract, *however minute or apparently immaterial in their effect* upon it, impairs its obligation."—Story on Const. § 1385, and cases cited.

The 5th section of the act of February 24, 1860, declares the construction which shall be put upon the act of 1854, and provides, that the company shall not be entitled to receive any part of the money previously promised, until it shall file in the office of the comptroller a declaration or agreement, made by the directors, and ratified by the stockholders in convention, that the construction thus placed upon the act of 1854 is the proper

construction, and that no advantage shall be taken of any different construction of which it may be susceptible. The same section also provides, that in taking the bond required of the company, proper provisions and conditions shall be inserted for the payment of the principal and interest of the loan in cash, in accordance with the construction placed by that section on the act of 1854. The requirement of "the declaration or agreement" of the company, is the imposition of an entirely new condition; and the provision' in reference to the bond contemplates a change in its form at least, if not in its legal effect. This 5th section of the act of February 24, 1860, is, therefore, unconstitutional and void, because it impairs the obligation of a valid contract between the State and the company, by imposing new conditions, and declaring that unless they are complied with the contract shall be abrogated.

It is said, however, that although this act is unconstitutional and void, so far as it seeks to change the terms of the original contract evidenced by the act of 1854, still it is effectual as a revocation of the authority conferred upon the governor by the last named act. The proposition is, that under the act of 1854, the governor is simply the agent of the State to issue a warrant in favor of the company; that the State had the right to revoke his agency, and that it has done so by the act of 1860. If the State can avoid the effect of a contract by withdrawing the authority of its agent to execute it, it is not easy to escape the conclusion, that the State would not be bound by any contract; for it rarely (if ever) executes a contract except through an agent, and if inclined to repudiate its obligations, it could do so, not directly, by changing or annulling the contract, but indirectly, by revoking the authority of its agent to execute it.

But the act of 1860 does not expressly revoke the authority conferred upon the governor by the act of 1854. It simply provides, that the company shall not be entitled to receive the money until certain conditions are complied with. These conditions, we have already seen, the legislature had not the constitutional power to impose; and it

is difficult to perceive upon what principle an implied revocation of a valid agency can result from an unauthorized attempt on the part of the principal to require of the other party to the contract the performance of new conditions. No doubt the legislature supposed that it had authority to make these requisitions of the corporation, and intended to revoke the agency of the governor, only in the event that the requisitions were valid. And it would be unjust to the legislature to infer that, by requiring of the company the performance of new conditions which it had not the right to impose, it intended to revoke the authority of its agent, and thus to destroy the means of executing the contract. It is upon a principle analogous to this, that an unconstitutional statute is not allowed to operate a repeal by implication of a prior statute with which it is in conflict; and even a repealing clause in an unconstitutional statute, declaring that "all laws contravening the provisions of this act be, and the same are hereby repealed," does not affect the previous laws.—Tims v. State, 26 Ala. 165. The act of 1854 created the agency; and certainly the revocation of that agency, which is, *pro tanto*, a repeal of the statute, cannot result by *implication* from a subsequent unconstitutional act. Having thus ascertained that the legislature has not revoked the authority conferred upon the governor by the act of 1854, it is not necessary for us to consider whether his agency is not in fact so far a part of the contract that the legislature would have no power to revoke it, even by a statute framed expressly for that purpose.

[4.] It has been suggested, that the act of 1854 is void for uncertainty; and that for that reason, if no other, this application should be refused. It is not to be denied that, in some of its parts, the statute is singularly obscure and difficult of construction. It clearly provides, however, that on the performance by the company of certain conditions precedent, it shall be entitled to receive at different times specific sums of money out of the three per cent. fund. Thus far all is clear; and the only doubts which can arise, as to the meaning of the statute, are as

to the obligations which the reception of the money and the execution of the required bond impose upon the company. This part of the act is separable from those to which we have referred as free from obscurity; and hence, it does not follow, that these last would fail, even if it were imposssble to assign a meaning to the former. This, however, is not the case. The statute first provides, that $250,000 of the three per cent. fund "be loaned or advanced" to the company, which is required to give bond for the payment, in the manner provided by the act, of the sums it may receive. This language very clea ly indicates, that the grant is by way of loan—not gift—and that the company is to be bound for its payment. What follows shows that the legislature contemplated the probability of future legislation as to the mode of payment, so as to authorize the payment in some other mode than cash; and the intention was, that if there should be no such legislation, and the repayment should be made in cash, then it should be made within ten years, with interest at five per cent. per annum after four years. In other words, the intention was, that in the absence of future legislation as to the mode of payment, the company was to be bound to repay the sums received within ten years from the receipt of the same, without interest for four years, and with interest at five cent. per annum after four years. And this, we think, is the legal effect of the bond which the company is required to execute.

We have not adverted to the act "to loan and appropriate the three per cent. fund and its interest," approved February 18th, 1860, (Acts '59–60, p. 54,) for the reason that it was, so far as the petitioner is concerned, a mere reaffirmance of the act of 1854, and can, therefore, exert no influence on the decision of the question now before us.

It is proper to remark, that the governor has shown no disposition to deny the jurisdiction of the courts over the question as to what is his legal duty in reference to the warrant claimed by the company. On the contrary, he expressly concedes it to be a legal question, determinable by the courts, and has done all that he could do, to facili-

tate the proceedings with a view to its early decision. The legislature having declared by the act of February 24, 1860, that the company should not receive any further payments out of the three per cent. fund, until it had complied with certain requisitions set forth in the act, the governor very properly felt it to be his duty to conform his action to this declaration of the legislative will, until it should be judicially determined that the legislature had not the power to impose such conditions on the company.

[5.] The judgment of the circuit court must be reversed, and, under the rule established in Edmonds v. Edmonds,. (1 Ala. 401,) Townsend v. Harwell, (13 Ala. 301,) and Rawls v. Doe, d. Kennedy, (23 Ala. 240, 255,) the cause must be remanded.