## S. S. PROUTY v. E. S. STOVER, *Lieut. Governor, &c.*

1. LEGISLATURE; JOINT CONVENTIONS; *General Statutory Rules.* A statute prescribes a rule of action for the future, and whatever comes within the limits of that rule must be controlled by it, although it may be an act not thought of, or even impossible, at the time of the passage of the law.

2. CONSTITUTIONAL LAW; *Repeals by Implication; Limitation of Power.* A constitutional amendment may repeal a statute by implication, but whether the amendment does work such repeal is determined by the same considerations that control in cases of an implied repeal by statute. Prescribing the manner of exercising a power is *prima facie* no limitation on the power.

3. ——— *Implied Constitutional Inhibitions on Legislative Power.* Constitutional inhibitions need not always be express. They are equally effective when they arise by implication. To create an implied inhibition there must be some express affirmative provision. The mere silence of the constitution creates no prohibition. To sustain an implied inhibition, the express provision must apply to the exact subject-matter, and the inhibition will not be extended further than necessary to give full force to the provision.

4. ——— *State Printer; Elections by Joint Convention.* Chapter 17 of the acts of 1861, providing for Joint Conventions of the two houses of the Legislature, (published as ch. 57, Gen. Stat. of 1868,) is applicable to the election of a state printer, is not repealed by the constitutional amendment of 1868, and is constitutional.

5. APPORTIONMENT; *Representative and Senatorial Districts.* To create a representative or senatorial district requires a law, the consent of both houses, and cannot be done by the separate action of either.

6. ——— *Qualifications of Members; Powers of each House.* Each house is sole and final judge of the elections and qualifications of its own members, but it cannot by virtue of that power increase its numbers above the limit prescribed by law, nor create a district and admit a member to represent it. The district must exist by law before the house can decide who was elected to represent it.

7. ——— *Number of Districts, Subject of Judicial Inquiry.* Where the legislature is made an electoral body, and a proceeding is had to contest the validity of an election by such body, the courts are not precluded by the action of the house in admitting members from inquiring into the legality of certain representative districts, and the rights of the members from those districts to vote at such election.

8. ——— *Apportionment Law; Naming Districts; New Counties.* A law which defines certain representative districts, and leaves others to be settled by the action of the people in organizing new counties, is one within the power of the legislature.

9. ——— *Unequal Representation.* An apportionment is not invalid because the representatives are not distributed among districts of absolutely equal population.

### *Original Proceedings in Mandamus.*

BY the adoption in 1868 of an amendment to § 4 of art. 15 of the constitution of Kansas, the office of State Printer was created. Said amendment provides that such officer shall be elected by the legislature in joint session — the election to be held on the third Tuesday of January in every second year, commencing in the year 1869. (House Journal, 1868, pp. 196, 394; Senate Journal, 1868, p. 326; Laws of 1870, p. 265.) The last apportionment act was passed in 1871 — ch. 14, laws of 1871, pp. 32 to 37. Sec. 1 of said act is as follows:

"SECTION 1. That the senate shall consist of thirty-three members, and the house of representatives of ninety members, but the number of representatives may be increased by the organization of new counties to not more than one hundred: *Provided,* That no county not now organized shall be entitled to more than one representative until the next apportionment."

At the convening of the session of the legislature of 1873 there were thirty-three senators; (Journal, pp. 4, 6;) and one hundred members were admitted and sworn as representatives; (Journal, pp. 3, 6.)   On Tuesday, the 21st of January 1873, the two houses met in joint session, Hon. *E. S. Stover*, Lieut. Governor, *ex officio* President of the Senate, and Hon. *Josiah Kellogg*, Speaker of the House of Representatives, presiding, for the purpose of electing a state printer for the term of two years commencing July 1st, 1873.   Three separate votes were taken.   On the first, *S. S. Prouty* received 65 votes, and George W. Martin 62, (absent, 6;) on the second, *Prouty* received 63 votes, and Martin 64, (absent, 6;) on the third, *Prouty* received 58 votes, and Martin 68, (absent, 7.) (House Journal, pp. 111, 112, 119.)   The convention held that there was "no election" on the first and second ballots, (Gen. Stat. 1868, ch. 57, § 6,) and on the third ballot determined that George W. Martin was duly elected.   Ten new counties were organized (as authorized by the act of June 4, 1861, Gen. Stat. of 1868, p. 249,) subsequently to the passage of the apportionment act of 1871, and were represented in the house of representatives at the session of 1873.   These counties, in the order of their organization, were, Rice, Sumner, Osborne, Reno, Smith, Harvey, Barton, Russell, Phillips, and Norton.   Excluding the votes of the representatives from these counties, (one was absent,) and the votes for state printer, on the *first* ballot above mentioned was, for *S. S. Prouty,* 62, for George W. Martin, 56.

*S. S. Prouty,* claiming to have been elected state printer by the legislature in joint session on the 21st of January 1873, commenced this action in this court, as plaintiff, for a mandamus to compel *E. S. Stover*, as Lieutenant-Governor, and *Josiah Kellogg*, as Speaker of the House of Representatives, to furnish him, the said *Prouty*, with a certificate of his election, as provided by § 1 of ch. 78, laws of 1869, p. 162.   An alternative writ was allowed and issued February 21st, 1873. The defendants showed cause, and the case was tried in this court March 10th.   The case is practically a contest between

*Prouty* and Martin for the office of state printer, and was so regarded on the hearing.

*Nathan Price, W. D. Webb,* and *Clough & Wheat,* for plaintiff:

1. On the 21st of January, 1873, the legislature held a joint session thereof for the election of a state printer. A vote being taken, 15 of the members of the senate, and 47 of the members of the house, (they being 47 of the representatives of the 90 representative districts mentioned in § 3 of the apportionment act of 1871, and three of the other ten supposed members of the house,) voted for plaintiff to be such state printer; and only 16 of the members of the senate, 40 of the representatives of said 90 representative districts, and six of said other ten supposed members of said house voted for Martin to be such state printer. And then, as a result of the voting aforesaid, it was, in and by the legislature in said joint session thereof, duly declared that said plaintiff had received 65 of the votes aforesaid, and that Martin had received 62 thereof, from which we see that a majority of the members of each house was present in said joint session, and then voted. (Two of the members of the senate, three of the representatives of said 90 representative districts, and one of said ten supposed members of the house, were absent.) Plaintiff was a citizen and an elector of the state, and therefore competent to be elected such state printer; and a majority of the members present, and also a majority of all the members of the senate and of said 90 representative districts, voted for plaintiff. A quorum was present, and a majority of that quorum voted for plaintiff, and therefore we claim that plaintiff was elected. It was and is the duty of the defendants to furnish plaintiff with a certificate of his election as required by § 1, page 162, laws of 1869; and mandamus will lie to compel the performance of that official duty. Code, § 688.

2. But even if a majority of a quorum might not elect, still we claim that plaintiff was elected, because a majority of the members of the senate and of said 90 representatives

voted for him; and we submit that said ten supposed members are not, and could not, under the constitution of this state, be members of said house of representatives, because of article 10 of said constitution, and the fact that the supposed districts they pretend to represent were not created by the apportionment act of 1871. If said ten districts were not entitled to representation, as we claim, it follows that a majority of all the members elect (62) voted for Prouty, and hence he was elected.

3. By § 1 of art. 2 of the constitution of this state, the legislative power is vested in a house of representatives and senate — the two houses composing "the legislature." By § 8 of said art. 2 it is declared that a majority of each house shall constitute a *quorum;* and by § 13 it is declared that a majority of all the members elected to each house, voting in the affirmative, shall be necessary to pass any bill or joint resolution; and by the 14th section it is, in effect, declared that two-thirds of the members elected to each house must approve a bill or joint resolution, to pass the same over the governor's veto; but by § 15 *two-thirds* of the *house,* where a bill is pending, are authorized to suspend the rules. As a majority constitute a quorum under said 8th section, therefore two-thirds of such quorum could suspend the rules. And by the 4th section of article 15, as amended, the legislature, in joint session thereof, is authorized to elect a state printer.

From these and other provisions of the constitution, it will be seen that the people themselves have determined when, and for what, more than a quorum is required; and by having in the constitution specified when and to do what acts either a majority or two-thirds of all the members elected, are required, it has impliedly been provided, *by the constitution,* that neither two-thirds nor a majority of all the members elected were required to vote together to do any act or thing other than in such cases as required by the constitution itself. The maxim, that *The express mention of one thing implies the exclusion of another,* is as applicable to constitutions as to any other instrument. 58 Penn. St., 338; 59 Penn. St., 109;

1 Sneed, 680. It is a settled rule of legislative law, that when a body, composed of a number of members, is authorized, either by a constitution or a statute, to do an act, that thereby authority is given to that body to proceed to do the act, when a majority thereof is lawfully present; or, in other words, that the giving of authority to such a body to do an act, authorizes a quorum thereof to proceed to the performance of that act; and the act of a majority of such quorum, is the act of the quorum, and the act of the quorum is the act of the body.

There is nothing in the constitution limiting the power given to the legislature by said § 4, as amended, nothing specifying the manner of the execution of that power, except that by § 1 of art. 4 it is in effect declared that the election should be *viva voce*. Nor is there anything in the constitution, as we understand it, bearing on the question as to how many members of the legislature must be present, or vote for the successful candidate at an election held under said § 4, except the aforesaid §§ 1, 2 and 8 of art. 2, and said amended § 4, and by implication by those other sections, which require affirmative action of either a majority or two-thirds of all the members elect to do an act specified in such other sections; construing said §§ 1, 2 and 8 of art. 2, and the amended § 4 of art. 15, together, or said amended § 4 alone, we submit it is clear that when a majority of each house had, on the 21st of January, assembled in joint session, that then *the legislature* was in joint session. Each house was there; that is, in joint session with the other when each had a quorum present. When the votes aforesaid were given, a majority of all the members elected to each house was present, and voted; and on such vote being taken, a majority of those present voted for plaintiff, and, therefore, we claim he was elected; and, in addition to the different sections of the constitution bearing on that point, we refer to the following cases, to-wit: 21 La. An., 79, 103; 32 Miss., 650, 677; 2 Mich., 287; 4 Mo., 303; 37 Mo., 270; 38 Mo., 450; Cooley Const. Lim., ·141; 1 Douglass, (Mich.,) 371; 20 Wis., 544; 2 Ashmead, 261;

4 Wharton, 532; Cushing's Law & Prac. of Leg. Assemblies, §§ 119, 120, 126 to 131, 175, 177, 178; Burrill's and Bouvier's Law Dic., titles, *Quorum.* And any determination of the effect of the vote by the legislature is immaterial. *Gulick v. New*, 14 Ind., 93.

Said amended § 4 of the constitution merely authorizes the election of a state printer; it says nothing of the return or canvass, and therefore of course the legislature could not sit or act as a board of canvassers. The duty of the legislature was performed, and its powers exhausted, when an election was made; that is, when all members present in the joint session had voted, giving a majority of their votes to one person — who happened in this instance to be the plaintiff. And when the election was effected, its powers under that section were at an end, (Cushing, §§ 205, 207, 99, 108; 33 N. Y., 603; 15 La. An., 464;) and then because of § 1, page 162, laws of 1869, it became the duty of the defendants to issue the certificate of election. All that was to be done after a valid election, was merely ministerial; no judicial power is given either to the legislature or any of its officers, by that § 4. 44 Mo., 223, 228; 10 Minn., 107; 1 Oregon, 123; 14 Ohio St., 322; 2 Ind., 423.

4. The legislature has no *inherent* power in regard to the election of a state printer. When in its joint session it had no power except such as was given it by the constitution, as so amended. Nothing could be done by the legislature in said joint session other than merely and only to elect a state printer, once, and only once; as that was all it was there authorized to do, it could pass no judgment, nor could it undo anything it had done, any more than any other body of electors. *Leavenworth Co. v. Miller*, 7 Kan., 486. The lawmaking power of the state is not to be exercised by the legislature in joint session. Its powers then, on that day, were limited to the mere election of a state printer. The houses must act and vote separately to make law, and as the legislature whilst in joint session only had the power to perform a single ministerial duty, to be performed because the several

members thereof were *ex officio* electors.   We submit it follows *that those electors* and their acts and doings *as such,* were governed and should be adjudged by the general rules of law in relation to electors, the same as though they had not been members of the legislature, their official capacity as members of the legislature having nothing to do with the matter except that because thereof they were *ex officio* such electors or voters at the election of a state printer.   And if we are right in claiming that the legislature was in joint session on said day, when a majority of all the members elected to each house were thus present, voting as aforesaid, it of course follows that a majority of those present voting for Prouty, elected him state printer, and it further follows that such election was under and by virtue of the constitution, and that the power then so exercised was a legitimate exercise of authority conferred by the constitution, thereby given to the majority so to do under such circumstances.

5. If it shall be claimed that because of section 6 of the act of May 7, 1861, (page 547, Gen. Stat. 1868,) that the legislature could not exercise the power conferred by the aforesaid amended § 4 of art. 15 of the constitution without complying with the requirements of the provisions of that § 6, then we submit that said § 6 is not applicable to this case, because of the terms thereof, and because the article of which it is a part is not in relation to joint sessions held by virtue of said amended § 4, and because enacted before said amended § 4 was adopted; but if we are wrong as to this matter of applicability, then we submit that said section 6 of the statute is void, because in conflict with the constitution, and because it is an attempted limitation by the legislature of its own powers.   If said § 6 of the statute is applicable to said amended § 4 of the constitution, then the statute is, in substance, that the provisions of the constitution and the power thereby given to a majority of a quorum may not be exercised by such majority, but that a greater number than required by the constitution voting in the affirmative shall be necessary to elect, and therefore that statute, if applicable, is

of course in conflict with the constitution and void. *Page v. Allen*, 58 Penn. St., 338; *McCafferty v. Guyer*, 59 Penn. St., 109; *Marbury v. Madison*, 1 Cranch, 137; 4 Md., 190; 24 Ark., 162; 2 Scam., 79; 1 Sneed, 680; 2 Metc., (Ky.,) 576; Cooley Const. Lim., §§ 63, 64; Story Const., §§ 424, 425.

That a legislature cannot, as to such matter as the election of a state printer, limit its own power or the power of any succeeding legislature, see 5 Cowen, 538; 12 Abb. Pr., 367; 14 Wis., 623; Cooley, 125, 284; 7 Cowen, 585; 17 Geo., 56; 30 Penn. St., 9; 1 Hilton, 563.

If said § 6 of the statute of 1861 would otherwise be applicable, we submit that because said amended § 4. of the constitution was adopted after that statute was enacted, therefore said § 4 of the constitution abrogated said § 6 of the statute. See *Taylor v. Smith*, 5 Chicago L. News, 255; 1 Sneed, 682.

If it shall be claimed that any action of the legislature cuts off inquiry as to whether plaintiff received a majority of the votes so given as aforesaid, then, against such claim, and to show that the court can inquire to ascertain and determine whether plaintiff received the majority he claims, we refer to the following cases: 1 Denio, 9; 19 Ill., 324; 25 Ill., 18; 2 Minn., 330; 2 Cal., 165–168; 4 Mo., 303; 32 Miss., 684; 8 Ind., 156; 13 Ala., 805; 8 B. Monroe, 648.

6. That it cannot be shown that the legislature meant anything other than that plaintiff received the 65 votes, see 6 Cal., 531; 33 N. Y., 285; and that after the legislature had in joint session exercised its power to elect a state printer, it could not then elect another, see Cushing's Law & Pr. of Leg. Assemblies, §§ 205, 206, 207; nor in any manner change the result of the vote as declared to be, 65 for plaintiff, and 62 for Martin, see Cushing, §§ 99, 108; 33 N. Y., 603; 15 La. An., 464; 22 Barb., 73; 45 Mo., 340. And see the following cases, which are to the effect that when an appointment to an office is once made it cannot be revoked or set aside otherwise than as specified by law: 19 Wis., 541; 4 Denio, 90; 14 Peters, 39; 13 Wis., 291; 20 Cal., 288;

23 Miss., 550; 34 Cal., 464; 6 Yerger, 167, 463; 5 Paige, 534; 6 Georgia, 432.

In the ordinary exercise of their powers as legislators, members may change their votes at any time before the result of the vote is declared, but never after the declaration of the result. (Cushing's L. & Pr., § 1828.) We claim that in this instance this right did not exist, as the members were not exercising their legislative powers, but were simply discharging a duty enjoined on them by the constitution, as electors; they were exercising the power of electors, not of legislators. But even if such right of change of vote existed, in this case the result of the vote, as shown by the journal, was declared, and the succeeding proceedings were separate and distinct votes. The people in this instance, instead of electing this state officer themselves, delegated the power of election to a certain limited number of the citizens of the state; the people could just as well have delegated this power to the other state officers, or to certain county officers, or to the judges of the different courts of the state, or to the judges of this court. But if they had delegated the power to the judges of this court, would any one say that this court or the judges of it were in so selecting an officer exercising any of their judicial powers? Clearly not, as in such case any of the officers we have named would only be exercising the powers of electors; and so were the members of the legislature in this instance, with neither greater nor less powers than electors at any election.

Of course, the general rules of law in relation to an election, whether the number of electors is definite, or indefinite, are applicable to this case; and as to constitute an election it is only necessary that at the proper time and place a person should receive the highest number of votes cast (when, as in this case, a named majority is not required,) to elect him to the office voted for, it is entirely immaterial after such an election what the voters think thereof, or whether they believe they have or have not elected a person to the office voted for. The legislature, in joint session, not being a judicial body,

of course it was not for it to determine any question in a judicial sense. If we are right in claiming that plaintiff received votes enough to elect him, it follows of course that he was elected; and if he was elected, then, in so far as the legislature attempted thereafter to determine there had been no election, it was usurping the province of the judicial branch of the government, wherefore such determination was void. Cooley on Const. Lim., 87, 116, 174, 176; 21 Wis., 491; 1 N. H., 199; 17 Mo., 590; 4 Greenl., 140; 10 Yerger, 59; 11 Mass., 396; 41 Ala., 157; 3 Greenl., 326; 46 Ill., 404; 2 D. Chipman, 77; 9 B. Monroe, 308; 7 Johns., 496; 5 Humph., 165; 4 R. I., 324.

7. We claim that the present house of representatives has only ninety members, and that those members are the representatives of the ninety representative districts specified in § 3, page 33, Laws of 1871. We ask attention to § 20 of art. 2, § 11 of the schedule, § 2 of art. 2, § 14 of art. 2, and §§ 1 and 2 of art. 10 of the constitution. As by the first of these sections each county organized at the time of the apportionment is entitled to at least one representative, and as each county was required to be divided into as many districts as it has representatives, it is apparent that in each apportionment of the state the districts were required to be specified, and by § 2 of art. 10 the legislature was required to make an apportionment in 1871, based upon a census made in 1870, and as by that section an apportionment is required to be made once in five years, the constitution itself, by the clearest sort of implication, prohibits the creation of any new representative district after the making of each respective apportionment, until the five years required by that § 2 shall have elapsed: 2 Kas., 249; 58 Penn. St., 338; 59 Penn. St., 109; 24 Ark., 162; Cooley on Const. Lim., 63–4; Story on Const., sections 424–425; 10 Wallace, 326; 4 Md., 190; 1 Sneed, 680; 3 Ill., 79; 1 Cranch, 174. And therefore it was we submit beyond the power of the legislature to, either directly or indirectly, create any new representative district after making the apportionment of 1871, and will so remain until 1876.

To apportion the state under said art. 10, it is necessary to make as many representative districts as there are to be members of the house of representatives during the succeeding five years.   To make a district requires a specification of its location.   We submit therefore that so much of § 1 of the act of 1871, as speaks of any increase of the number of representatives, is void.   But even if it were not void, as there is no increase over the ninety therein made, we submit that any such increase could only be made by and with the consent of the law-making power, expressed, as required by the constitution, in the form of a bill, duly enacted, so that even if that § 1 can be held (which we claim it cannot) to, in effect, create one hundred representative districts, ten thereof respectively on condition of the organization of that number of new counties, it would be incumbent on the law-making power, by bill, to determine which of the more than ten newly-organized counties should be represented.   To allow the house of representatives to make such determination, would be to allow that branch of the legislature by itself to apportion a part of the state, and create a representative district, which it would, in effect, do, if it could admit a person as member thereof, without a law previously enacted by bill, as required by the constitution, designating the districts which might be so represented; and, of course, it is not within the power of the house of representatives alone so to do.   And if there are only ninety members of the present house of representatives, then, as said ninety members filled all the offices of that character in the state, the other ten supposed members were not even officers nor members of the legislature *de facto*. 1 J. J. Marsh., 206; 1 Dillon, 130, 136; 25 Iowa, 12; 24 Wendell, 541.   And the opinion of this court in case of *McCahon v. Leavenworth Co.*, 8 Kas., 437.

The word "members," in the 8th section of art. 2 aforesaid, means and refers to the individuals referred to as "representatives" in § 2 of said art. 2, and the 1st section of art. 10, or to senators; or, in other words, by said 8th section power is given each house to determine what person shall be

its member from each of the several representative and senatorial districts, created and defined as required by said article 10; but such power extends no further; and § 8 does not authorize either house to admit a member from a district not created or defined by the legislature, as and in the manner required by the constitution. If it did, then it would follow that either house could admit as many persons as members thereof as it might see fit. The members of each of the present houses are those persons elected thereto by the qualified electors of the several senatorial and representative districts specified in the apportionment act of 1871. Who those persons are, each house may, by virtue of said § 8, determine for itself; but neither house can, because of said § 8, *create a district*, and admit a member therefrom.

*Martin & Case*, and *Stillings & Fenlon*, for defendants:

1. As there were 100 members of the house and 33 members of the senate, being 133 members elected to the two houses, it is manifest that S. S. Prouty did not on any vote receive the votes of a majority of all the members elected to both houses. And it is equally manifest that on the last vote taken George W. Martin did receive the votes of a majority of all the members elected to both houses. But it is said that there is an antagonism between the provisions of the amendment to the constitution, and the rule laid down in the 6th section of the act of 1861, in this, that the amendment requires that the state printer "*shall be elected by the legislature in joint session*," and said § 6 requires a majority of all members elected to both bodies; and it is claimed by plaintiff that the act of 1861 in this particular is unconstitutional. But this position cannot be maintained; the amendment to the constitution simply confers a power not before possessed by the legislature, upon that body; and the only restriction imposed or qualification in regard to its exercise, is, that the state printer shall be elected by the legislature "in joint session." There is nowhere in the constitution anything prohibiting the legislature from providing that it shall be

necessary to an election by it, that a candidate shall receive the votes of a majority of all the members elected to both houses. It is familiar law that the state legislature possesses all legislative power not forbidden by the constitution. Here, then, is a general grant of power to the legislature in joint session. How many votes in this joint session shall be necessary to an election, is a question not answered by the constitution, but left by the constitution to the wisdom of the legislature to prescribe.

The election by the legislature of a state printer is not a legislative act proper. It is not the making of a law to which the separate assent of a majority of all the members elected to each house is necessary. It is a simple grant of power to be exercised by the legislature in joint session, in such manner as the law-making power shall provide. The fundamental law, then, only confers the power and imposes the duty of electing a state printer. The general deposit of legislative power in the legislature of the state is called into requisition to supply the necessary and appropriate details by which the power to elect shall be exercised. The constitution provides that "all elections by the legislature shall be *viva voce*," and all by the people shall be by "ballot," and § 19 of art. 2 says " the legislature shall have power *to provide* for the election or appointment of all officers and the filling of all vacancies not otherwise provided for in this constitution." The constitution creates the office of state printer simply as it does the state offices, sundry county offices and township offices. It provides that this office shall be filled by the election by the legislature; that state officers and supreme judges shall be elected by the electors of the state; district judges by the electors of the districts respectively; county officers by the electors of the counties respectively; and township officers by the electors of the township. But nowhere does the constitution itself prescribe the number of votes which shall be necessary to an election either by the legislature or the people, but leaves that under § 19 of art. 2, to the legislature, where it confers the power directly "to provide for the

election," when not otherwise provided for by the constitution, and this view is additionally strengthened by § 1 of art. 15, which prescribes, " That all officers whose election or appointment is not otherwise provided for, shall be chosen or appointed *as may be prescribed by law.*" These sections of the constitution are the only warrant for the legislature in the passing of the general election law of the state. This law " prescribes " that the person receiving the highest number of the votes of the electors of the state for the office of chief justice, shall be elected; that the person receiving the highest number of votes of the electors in any given county for the office of probate judge shall be elected. Has any one ever questioned the validity of this law? the power of the legislature to enact it? By the election law of the state the legislature has " prescribed," not that a majority of the electors shall be required to effect an election, but has so enacted that, in many instances, the chosen man for public place is the choice of a very small minority. Yet no one has questioned the right of the legislature to so prescribe. The grant of power to so do is so plain that in the twelve years of our constitutional history it has never been disputed. If, then, the legislature has the right to " prescribe by law," how " all officers not otherwise provided for shall be chosen," and the exercise of that power stands unquestioned in popular elections, how can it be denied in legislative elections? There are but the two kinds of elections — popular and legislative. The constitution says the people shall elect in one case, and the legislature in the other, and there it stops, giving the legislature the power to provide for the election of all officers, and providing that " all officers· shall be chosen as may be prescribed by law." It surely cannot be claimed that neither of these sections applies to the present case, because this amendment of 1868 provides for this election. It simply creates the office and indicates the power to elect the officer. As in the case of a probate judge, it creates the office and indicates the power that shall have the right to fill it. If this amendment provides for the election, then the election of every

17—11 KAS.

constitutional officer is provided for by the constitution itself. If the legislature may say that a minority may elect at a popular' election, and thus "prescribe by law," why may it not prescribe by law in a legislative election that a majority of all the members elected to both houses shall be necessary to elect? The power—discretion—is vested by the same sections of the organic law; and it may be added that this discretion has been exercised by our legislature in harmony with the legislation of other states having similar constitutions, and also in the spirit of our constitution. While a plurality may elect in most of the states in popular elections, a majority of the members of both houses is required by most, if not all of the states, to effect a legislative election. While under our constitution a quorum, being a majority of each house, is competent to transact business, it is not competent by a majority of a quorum, simply, of each house to pass any bill or joint resolution. "A majority of all the members elected to each house, shall be necessary to pass any bill or joint resolution." An additional power being conferred by the amendment of 1868, the wisdom of the legislature is shown in the establishment by law of a rule that requires the same number of votes to elect an officer as to pass a law. It is in harmony, therefore, with the spirit of the constitution, tending to secure, as it does, by the large vote required, competent and faithful public officials. As bearing generally on the power of the legislature, see: Cooley on Con. Limitation, 87; 9 Wis., 276; 28 Iowa, 267; 44 Mo., 346; 45 Mo., 340; 1 La. R., 387.

In *Commonwealth v. Maxwell*, 27 Penn. St., 460, Judge Woodward, discussing principles applicable to this case, says: "We have to consider the constitution as furnishing the *principle* of government, instead of the rule of action. It prescribes popular elections, and leaves the legislature to regulate them. The error springs from the attempt to deduce, not only the *principle*, but the *rule of its application* from the constitution. 'A constitution,' said Judge Gibson, 'is not to receive a technical construction like a common-law instru-

ment, or a statute; it is to be interpreted so as to carry out the great principles of government, not to defeat them, and to that end its commands as to time or manner of performing an act are to be considered as merely directory whenever it is not said that the act shall be performed at the time or in the manner prescribed and no other.' When, therefore, we construct a rule by implication of such rigor and inflexibility as to defeat the legislative regulations, *we not only violate accepted principles of interpretation, but we destroy the very right which the constitution intended to guard.*" And at page 461 ' the same learned judge says: "The constitution prescribes an election without defining it. The law defines the conditions under which the election shall take place, and because they are not unreasonable conditions, but such as are favorable to a deliberate and cautious performance of the duty, such, in fine, as are calculated to make the election what the constitution meant it should be. *It would be a gross misapprehension to confound this with a legislative attempt to repeal the constitution.*"

2. The final action of the joint convention, as declared by the presiding officers, and the certificates of the president of the senate and the speaker of the house certifying that final result, is conclusive of the question as to who was elected state printer by the joint session. Whether it was in the power of the joint session legally and constitutionally, to declare Mr. Prouty elected on the first vote, is not now a question; that he was not so declared, is shown by the journals; and that the body proceeded to a second and a third vote, is also shown by the journals. As long as the body was in session it was in its power to change its vote on any question before it in any manner it desired. To deny it this power would be to deny it the power to protect itself against fraud or imposition of any character. The right to change votes at any time before final action, is a right essential to all parliamentary bodies; that votes were changed in the election of state printer, is shown by the journals. That the entire joint session consented to a second and third vote, is also

shown by the journals, which show that all present voted each time. Who shall deny the body that power? And having finally taken the third vote, and being satisfied therewith, and there being a majority of all the members elected to both houses of the legislature voting in favor of Martin, the result was then formally announced and the certificate to Martin issued as prescribed by law. Shall this court set aside the action of the joint session, and annul its judgment upon a question committed solely to the legislature? Cooley Const. Lim., 41; 5 Mass., 524. There is no power in this court to annul the judgment of the legislature on this question: Cooley Const. Lim., 133; 5 Ohio, 358; 17 Cal., 11; 13 Mich., 481; 17 Md., 309; 44 Penn. St., 336; 3 Gray, 468; 6 Wheat., 204; 33 N. Y., 285.

3. All that Prouty can claim according to the most liberal view is, that on the first vote as shown by the journals, he received enough votes to elect him, if the joint session was at liberty to disregard the provisions of the act of 1861. But the members who voted for him, immediately changed their votes. His inchoate right, if we may so call it, never came to perfection; and unless he had a perfect indefeasible legal right to the certificate he claims, he has no case in this court. That this court has no power to inquire into the legality of votes in the joint session, see Cooley, 133; 13 Mich., 481; 17 Md., 309; 44 Penn. St., 336.

The opinion of the court was delivered by

BREWER, J.: This is a proceeding by mandamus, instituted in this court, to compel the Lieutenant-Governor of this state and the Speaker of the House of Representatives, to furnish the plaintiff, S. S. Prouty, with a certificate of his election as state printer of the state of Kansas, he claiming to be entitled to such certificate by virtue of the proceedings had in the joint session of the legislature on the third Tuesday of January, 1873. Three questions are presented, two of which at least must be decided in favor of the plaintiff before he will be entitled to the relief sought. First, Could a majority of

members present in the joint session and voting, elect, or did it require a majority of all the members elected to the two houses?    Second, Did the house of representatives consist of more than ninety members?    Third, Can this court look back of the final declaration of the result by the joint convention, to see whether upon either of the votes any one other than the one declared elected, was in fact elected?    These questions, as can readily be seen, are, so far as this court is concerned, of a delicate nature, for they concern the regularity of the proceedings of the legislative branch of the government; and they are also questions of great moment, for they involve the rightfulness of the organization of at least one body of the legislature.    Our examination has been assisted by the efforts of able counsel, whose briefs are full and elaborate, and whose arguments were models of clearness and strength.    We have given to the case the full consideration which its importance demands, giving to it a priority of attention in view of the public interests affected by its result.

There is no dispute as to the facts, and the questions are purely questions of law.    On the first call of the roll, as shown by the journal of the proceedings of the joint convention, S. S. Prouty, the plaintiff, received 65 votes, and George W. Martin received 62 votes. No other votes were cast, so that the plaintiff received a majority of all the votes of all the members present and voting.    Was he thereby elected?    Art. 15, § 4, of the constitution, as amended in 1868, provided that a state printer should be "elected by the legislature in joint session."    This section is silent as to the manner of voting, or the number of votes necessary to elect; and if there be no limitation prescribed elsewhere it would seem that a majority of all the votes cast was sufficient.    In 1861 the legislature passed an act to regulate the proceedings of joint conventions which, at least in terms, has never been repealed.    Sec. 6 of that act reads, "that to elect any person in said joint convention a majority voting in the affirmative of all the members elected to the two houses shall be necessary."

*Statement of facts.*

*1. Joint conventions. Act of 1861 construed.*

(Gen. Stat., 547, ch. 57, § 6.)   As there were 133 persons
elected and admitted to the two houses, the plaintiff failed
by two votes of bringing himself within the rule prescribed
in this section.   To avoid this plaintiff claims, first, that this
act is inapplicable; second, that it was repealed by the con-
stitutional amendment of 1868, and third, that it is uncon-
stitutional.   Was it inapplicable?   The election of a state
printer is not one of the things named in the act to be, or
which may be, done in the joint convention.   Such an officer
was then unknown to our laws, and of course was not within
the thought of the legislature when it passed that act.   Yet
the language is broad and comprehensive: "The two houses
shall meet in joint convention for the election of United
States senators, or for the purpose of doing any other act that
may be authorized by law."   It includes everything that a
joint convention has power to do.   It is prospective in its
reach, and every act which a joint convention may hereafter
be required or authorized to do, must, while that statute re-
mains unrepealed, be done according to the rules and limita-
tions therein prescribed.   The legislator acts for the future,
as the judge does for the past.   He prescribes a rule of con-
duct, and everything which comes within the limits of that
rule must be guided by it.   And when an act comes within
the plain limits of a legislative rule, it is no objection to the
applicability of the rule, that the act was not thought of, or
was even impossible, at the time the rule was established.

Was said act of 1861 repealed by the constitutional amend-
ment of 1868?   The amendment created the office of state
printer, and gave to the legislature the power of election.   It
2. Repeals by implication. was silent as to the manner and requisites of
election.   These are prescribed in the act.   The
amendment did not in terms repeal the act.   It could op-
erate as a repeal only by implication.   But to repeal by
implication, there must be an inconsistency, a conflict between
the two.   The manner and requisites of election as prescribed
in the act must amount to a limitation on the power granted
by the amendment, or the two can stand together, and there

is no repeal. *Prima facie* there is no inconsistency, no con-
flict between the grant of a power and the regulations under
which that power may be exercised. Judicial power is vested
in certain courts. Prescribing the method of procedure in
those courts is *per se* no limitation on that power. Power to
enact laws is vested in the legislature. The rules and orders
for transacting business work no abridgment of that power.
But it is claimed that under the name of a regulation this
section really works a limitation, because, by § 8 of art. 2 of
the constitution a majority of each house constitutes a quorum;
that when a quorum is present the house is present; that a
quorum can transact any business except such as by specific
sections of the constitution require the concurrence of a larger
number; that a majority of the quorum binds the quorum;
that its act is the act of the quorum, and therefore the act of
the house; that this amendment grants the power of election
to the legislature in joint convention, that is, to a convention
composed of a quorum of· each house; that the majority of
that convention, thus organized, binds the convention, its act
is the act of the convention, and executes the power granted
to the convention. The propositions thus stated bring up
the third inquiry presented concerning this section: Is it
constitutional? The claim made is really two-fold: first,
that in the absence of express limitations the majority of a
quorum of a deliberative assembly can do any act and exer-
cise any power of that assembly, and second, that because the
constitution has expressly declared that a given proportion
of one or both houses shall be requisite for certain specified acts,
it impliedly inhibits any limitation upon the power of a quorum
in all other cases. The limitations on the power of that quorum
3. Limitation on legislative power.    are in this case expressed, expressed in the act of
the legislature. All legislative power is vested
in the legislature. Prescribing the rules, manner, and requi-
sites of elections, is a legislative act. There is no express
constitutional inhibition. Implied inhibitions are, it is true,
equally potent; but their existence must be equally evident.
Good illustrations of implied inhibitions are found in the

cases cited by counsel from Pennsylvania. The constitution of that state prescribed certain qualifications for voters. The legislature by statute attempted to impose additional ones. This the court decided could not be done. The constitution, they say, by imposing certain qualifications upon voters impliedly authorized every one possessing those qualifications to vote, and forbade the requirement of anything more.* "*Expressio unius, exclusio alterius.*" *Page v. Allen,* 58 Penn. St., 338; *McCafferty v. Guyer,* 59 Penn. St., 109. To sustain an implied inhibition there must be some express affirmative provision. The mere silence of the constitution on any subject cannot be turned into a prohibition. Take the illustrations cited. Were the constitution silent as to the qualifications of voters, that silence would not by implication or otherwise restrain the legislature from prescribing them. The power of the legislature to prescribe them would be unquestioned. Again, to sustain an implied inhibition, the

<div style="margin-left:2em">Application of implied inhibitions.</div>

express provision must apply to the exact subject-matter, and the inhibition will not be extended further than is necessary to give full force to that provision. Pursuing the same illustration, a mere registry law will not come within the implied inhibition, even though it require the voter to do some acts to establish his right to vote, and though it frequently operate to deprive a legal voter of his vote. Such a law is concerning the general subject of voting, and elections, but it does not reach to the exact matter of qualification; and on the other hand full force can be given to the constitutional provision without interfering with the law. To declare a law void as conflicting with an express provision of the constitution, the conflict must be clear. So say all the authorities. None the less clear must the conflict be, when it is conceded that no express provision has been violated, and only claimed that some negation must be implied from the affirmative language of the constitution which is irreconcilable with the law. Now there are some sections of our constitution which require for specific acts the concur-

[* AND see *The State, ex rel., v. Williams,* 5 Wis., 308, 315, 316.]

rence of a certain proportion of the members elected to either house: Art. 2, § 13, § 14, and § 27; art. 3, § 15; art. 11, § 5; art. 14, § 1, and § 2. But these sections all refer to the action of the two houses meeting in separate session. They prescribe the number of votes in each house which shall be necessary for certain purposes. They nowhere and in no manner refer to the action of the two houses meeting as one body in joint session. The joint convention is a body as different, and with as distinct powers and functions from those of the two separate houses, as a partnership is from the individuals composing it. Even if it were conceded that these sections cited operated as an implied prohibition on any statutory limitation of the power of a majority of a quorum in the separate houses, still they would not bear upon the powers of a majority of the quorum of a joint convention. A joint convention is a body not recognized by the constitution prior to the amendment of 1868, unless it be by the use of the phrase "the legislature shall by joint ballot," in § 2 of art. 1. And the use of this phrase, if it refers to a joint convention, suggests this inquiry: The candidate at a popular election receiving the highest vote for any office, state, county, or city, is declared elected. This has always been the rule in this state, established by statute, and questioned by no one. Sec. 2 above referred to provides that in case two or more candidates for any state office receive an equal and the highest number of votes the legislature shall choose by joint-ballot one of such candidates. At such a legislative election must a candidate have a majority of a quorum, that is, a majority of all the votes cast, or will a plurality elect, as at the popular election? Is this question settled by the constitution, or may the legislature determine it? And if the legislature can say that less than a majority of a quorum shall elect, may they not also say that more than such majority shall be requisite? But again, the act of voting is not a legislative act. Giving the election of printer to the legislature in joint convention, simply creates an electoral college composed of the members of the two houses. The

4. Elections by joint convention. Act of 1861 sustained and construed.

powers of the college thus created are no greater than if the college had been composed of the probate judges of the several counties convened for that purpose. Shall it be said that limitations placed upon the action of the several houses, when performing their appropriate legislative functions, or certain limited judicial duties, apply either directly or by implication to the powers of an electoral college composed of the members of those houses? It seems to us therefore that the act of 1861 is applicable; that it was not repealed by the amendment of 1868, and that it is constitutional.

The second question presented is, did the house of representatives consist of more than ninety members? It is

5. Apportionment. Representative and Senatorial districts.

claimed by plaintiff that the senate consisted of thirty-three, and the house of ninety members; and that these ninety were the representatives of the districts specified in § 3 of the apportionment law of 1871. (Laws of 1871, pp. 33 to 37.) It appears from the journals that of these 123 persons claimed to be the duly legal members of the legislature 62 voted for plaintiff. This being a clear majority, plaintiff insists that he comes within the rule prescribed in § 6 of the act of 1861, heretofore quoted, and was therefore elected. It is conceded that one hundred persons were present in the house of representatives, claiming to be members, recognized and admitted as members, and discharging equally the duties of members. Ninety of these represented the districts specified in said § 3, and ten were from counties organized subsequently to the apportionment act of 1871. Defendants claim that this court cannot look beyond the action of the house to inquire whether persons admitted as members were legally entitled to seats. Art. 2, § 8, declares that each house "shall be judge of the elections, returns and qualifications of its own members." Its determination is not the subject of appeal or review. It is final,

6. Qualifications of members. Powers of each house.

and concludes every one. But what is included in this power? Does the power to judge of the qualifications of its members, include the power to increase such membership? Can it enlarge its members

without limit? Is it like an academy of science, or a lodge of odd-fellows, capable of indefinite expansion? If the law fixed the number of senators at twenty-five, could those twenty-five admit twenty-five more on pretense of judging "of the elections and qualifications of its own members," and thus create a senate of fifty members? If this power exists, how easily could a partisan majority secure to itself a two-thirds vote by simply admitting new members. To create a representative or senatorial district requires a law, the consent of both houses. Neither house by itself can create a district, and then admit some one to represent it. The district must exist before it can be represented. Otherwise one house could usurp the functions of both. And if one house can admit members above the limit prescribed by law, why may it not above the constitutional limit? But when the *district* exists, then the decision of the house as to who shall represent that district is conclusive and final. It determines who was elected; whether the returns are sufficient, and also whether the party elected has the proper qualifications. Over all these matters its jurisdiction is ample, its determination final. How far an inquiry could be pursued into the particular persons voting for any law, so as to attack its validity on the ground that it received its majority only by the votes of those not legally members, we need not now decide. Many considerations other than those appropriate to this may affect that question. Here the plaintiff challenges certain voters. He contests an election, and

7. The number of districts is the subject of judicial inquiry.

claims that of the legal voters he received a majority. In such an issue we think he may show that certain persons were allowed to vote as representatives of districts which had no existence, and the judgment of a single house that there were such districts does not conclude him. *Commonwealth v. Meeser*, 44 Penn. St., 341. Had these ten districts (counties organized subsequently to the passage of the apportionment act of 1871) a legal existence? The first two sections of art. 10 of the constitution are as follows:

"SECTION 1. In the future apportionments of the state, each organized county shall have at least one representative; and each county shall be divided into as many districts as it has representatives.

"SECTION 2. It shall be the duty of the first legislature to make an apportionment, based upon the census ordered by the last legislative assembly of the territory; and a new apportionment shall be made in the year 1866, and every five years thereafter, based upon the census of the preceding year."

In pursuance of these sections the legislature of 1871 passed an apportionment act. (Laws 1871, p. 32.) The first section of that act is as follows:

"SEC. 1. That the senate shall consist of thirty-three members, and the house of representatives of ninety members; but the number of representatives may be increased by the organization of new counties to not more than one hundred: *Provided,* That no county not now organized shall be entitled to more than one representative until the next apportionment."

Section two defines the boundaries of the senatorial, and section three those of the ninety representative districts. To create a district requires a law — a law, the consent of both houses. Conceded. But does not this law create the ten disputed districts? Is not the language equivalent to this — that the house shall consist of 100 members, of whom ninety shall be from the following districts, and ten from the first ten counties that may hereafter be organized. Nothing further is to be done by either or both houses. The organization of both houses identifies the districts, and entitles to representation. The law is as complete as the law for the government of cities of the first class. No cities are named, but as soon as it is established that a city has over 15,000 inhabitants, it becomes subject to the provisions of the law. No further legislation is required. No counties are named as constituting these ten districts; but as soon as the fact is established of their organization they become entitled to representation. But it is claimed that such a construction places the law at variance

8. Apportion-
ment Law.
Naming and
number of
districts. New
counties.

with the constitutional provisions just quoted; that they re-
quire an apportionment every five years, and impliedly forbid
any changes intermediate the apportionment; that an appor-
tionment implies a distribution ·of the full representation
among the population according to its present numbers and
location, and that there is a new apportionment, a reassign-
ment of representation every time a new representative is
added, as much so as if there were a change in the bounda-
ries of the old districts.   There is great force in this argu-
ment; and if the section stopped with the creation of a house
of ninety members, and a subsequent legislature by law
attempted to create a new district, we should be brought
squarely to the question of the power of the legislature to
change the representation intermediate the apportionment.
But this apportionment is, as we think, of the full house, of
100 members.   It distributes ninety among the organized
and ten among the unorganized counties.   It names the
boundaries of the ninety districts, and leaves the ten to be
determined by the priority of county organization.   It is
providing for a legislature which is to be elected and to meet
in the future, and it may rightfully assume that in a new and
growing state like this the changes of a summer will add
9. Basis of repre-      many to the list of organized counties.   But it
sentation;
inequality of      may be said such an apportionment is based not
districts.        upon the census of the preceding, but the expecta-
tions of the coming year.   An apportionment cannot be over-
thrown because the representatives are not distributed with
mathematical accuracy, according to the population.   Some-
thing must be left to the discretion of the legislature, and it
may without invalidating the apportionment make one dis-
trict of a larger population than another.   It may rightfully
consider the compactness of territory, the density of popula-
tion, and also we think the probable changes of the future in
making the distribution of representatives.   It seems to us
therefore that the ten disputed districts legally existed; and
therefore this question must be determined against the plain-

tiff. The determination of these questions compel a judgment for defendants. Peremptory mandamus refused.

KINGMAN, C. J., concurring.

VALENTINE, J.: I concur with my brethren in the decision of this case, but do not concur in all that is said in the opinion or syllabus.