THE STATE OF KANSAS *ex rel.* JOHN SPEER *v.* R. A. BARKER, SECRETARY OF STATE, Respondent.*

*Application for Writ of Mandamus.*

Where relator, holding the contract under the general statute regulating public printing, May 16th, 1861 [Comp. L., 753], for printing the laws from December, 1867, to December, 1868, and where the legislature of 1867–8 passed [March 3d, '68] an act providing for printing, under supervision of compiling commissioners, their compilation of statutes, including the laws of 1867–8, under the name of "General Statutes," and for letting by them of the contract therefor, which contract they let to another than the relator, it was

*Held,* that the relator held a contract with the state which was valid and subsisting, for printing the laws of the session of 1867–8.

*Held,* that the law of 1861 was one authorized and enjoined by the constitution of the state.  [Art. 15, § 4, Comp. L. '68.]

*Held,* that the legislative power over the printing of the laws of the current year had been exhausted.

Though the legislature may modify and repeal acts of former legislatures, and cannot abridge succeeding legislative action, yet it was

*Held,* that where a contract is made under authority of law, the right of property arising from the contract cannot be divested by subsequent legislative action; and that the act of March 3d, 1868, so far as it provides for printing the laws by any one besides the relator, is void, as in conflict with art. 1, sec. 10, of the federal constitution.

It was the respondent's duty to furnish copy of the laws for relator.

*Contract* defined:  The agreement of two competent parties about a legal

---

* For a counterpart to this case, growing out of the same state of the law and facts, see The State *ex rel.* Reynolds *v.* R. A. Barker, Sec'y of State.

and competent subject matter, upon a mutual legal consideration, with a mutuality of obligation. [1 O. S., 657.]

The facts of the case are stated in the subjoined opinion of the court.

*Martin, Morton & Burns,* and *Williams & Hanback,* for relator.

*Geo. H. Hoyt, Attorney General,* for respondent.

*Williams* wrote :

That the relator's contract for printing the laws extended from the 4th Monday of December, 1867, to the 4th Monday of December, 1868. The secretary of state is bound, under the law, to furnish copy on demand. A proper demand was made, and the copy refused on the ground that the law of March 3d, 1868, provides for a new letting of the contract for printing the laws of the session, and the contract had been let to another than relator. Relator's contract conformed to the law (*See Sec'y State's Report for* '67 ; *Comp. L.,* 756, § 7 ; 761, § 1), and embraced the work named in the law of 1868.

It was an executory contract, and within the protection of the federal constitution, prohibiting any state from passing "any law impairing the obligation of contracts." 1 *U. S. Dig.,* 554 ; 6 *Cr.,* 137 ; 9 *id.,* 52 ; 3 *O. S.,* 361, 497.

The relator had given bonds for performance of this work, and is liable for any breach thereof. The obligation must be mutual. The contract made, means something. (5 *O. S.,* 361, 997 ; *see also* 4 *Litt.,* 34.) And also

was prohibited by the state constitution, providing that " no bill shall contain more than one subject, which shall be clearly expressed in its title." (*Art.* 3, §16, *Const.*) The act of 1868, as published, has no enacting clause, as required by art. 3, sec. 20. The act itself does not disclose whether it be an expression by bill or by joint resolution.

The act of 1868 has not been published, as is required by art. 3, sec. 19. The publication of half an act is no publication at all, in law.

On the general subject of legislative contracts, see *Sedgk. Stat. Constr.*, 616; 9 *Cal.*, 81; 16 *id.*, 11; 21 *id.*, 115; *Smith Const. L.*, 384, § 252.

*Hoyt*, for respondent, contended :

By the provisions of an act of the legislature, approved March 8th, 1868, entitled "An act concerning the general statutes," all acts revised by the commissioners appointed to revise the general laws of this state, and reported to and enacted by the legislature; all other acts of a general nature, enacted at its last session; certain acts described by title and chapter in said act, or so much thereof as remained in force at the time of the passage of this act; all acts relating to common schools then in force, etc., etc., are required to be printed under the editorial charge and superintendence of the commissioners appointed to revise and codify the laws. *See art. 2, Gen. Stat. act, Mch.* 3, '68, *pub. Mch.* 7, '68.

This act required the secretary of state, auditor and treasurer to immediately advertise for sealed proposals for delivering to the secretary of state five thousand copies of the volumes of the said general statutes,

printed and bound in the manner and style provided, and, conforming to other requirements of the act, to award the work to the lowest and best bidder.

The relator is not entitled to the manuscripts required for the volume of the general statutes, because he did not bid for the work, and because the award was made to another party.

The provision of the federal constitution never has been understood to embrace other contracts than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice. (*Dartmouth Coll.* v. *Woodward*, 4 *Wheat.*, 518.) It is not intended to apply to public property, to the discharge of public duties, to the possession or exercise of public rights, nor to any changes or qualifications in any of these, which the legislature of a state may at any time deem expedient. 2 *Kent's Com.*, 681, *and cases cited in note "b."*

The framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and the instrument they have given us is not to be so construed. 2 *T. R.*, 352; 1 *Ohio S. R.*, 603–657; 10 *How.*, 416; 11 *Peters*, 421; 5 *Cow.*, 538.

If the relator, under his so-called contract, is entitled to the manuscripts of the general statutes, he is also entitled to print them in the manner which accords to his undertaking, and can so defeat the will of the legislature, as to the form and matter of the compilation authorized by them.

*By the Court*, KINGMAN, C. J.

The relator shows that in December, 1867, he was

awarded the printing of the general and special laws
of this state for the year next ensuing ; that he gave
bond for the performance of his contract, and is ready
to perform it ; that he has applied to the Hon. R. A.
Barker, secretary of state, for, and demanded a copy
of the laws passed last winter, which demand has been
refused. The secretary of state appears and resists
the motion for a mandamus, and presents, as his ob-
jection, the law of last winter, March 3d, 1868, provid-
ing for the letting, by commissioners, of the contract for
printing and furnishing 5,000 copies of the general stat-
utes. By consent, all the facts are presented on this
motion, and the secretary shows that under this law
the printing of the general statutes has been awarded
to another person than the relator, who now has the
contract. Under the law, as it was before this enact-
ment of last winter, the relator was clearly entitled to
the printing of the laws, and it was as clearly the duty
of the secretary to furnish him the copy. Did the law
of the last session divest him of this right? The rela-
tor claims that this law is in violation of that part of
section ten, of article one, of the constitution of the
United States, that declares that no state shall pass
any laws impairing the obligations of contracts.

This is the only question involved in this motion,
and it is one presenting no great difficulty. This clause
of the constitution has been the subject of much dis-
cussion, and has elicited elaborate and exhaustive ar-
guments and opinions from the federal and state courts,
as different questions have demanded settlement.
Probably no part of the federal constitution has called
out so much learning, and been the subject of such
critical examination, as this. Happily for the profes-
sion, it has received from the highest judicial tribunal

in the land, an authoritative exposition in so many cases, presented in so many varying phases, that its application is not generally attended with any great difficulty.

Most of the questions that have arisen under this clause, have been, as to the effect of laws changing the remedy, and as to how far such changes have impaired the obligations of the contract, or as to what constituted a contract within the meaning of that clause. On both of these points there has been much difference of opinion, and much learned discussion; but theories, however plausible or logical, have been made to yield to decisions, and reasoning that has convinced many thoughtful men, has been made to give way to the force of absolute authority.

It is not within the scope of our ambition to press any special views of our own, but simply to follow the authoritative decisions of the Supreme Court. Satisfied that we find the law plain, we do not care to inquire whether it be logical, or harmonizes with theories.

The Dartmouth College case (4 *Wheaton,* 519) shows how far the court will go in holding legislative action a contract, which subsequent legislatures cannot disturb; and on the other hand, the Charles River Bridge case (11 *Peters,* 420) shows what the court will not hold as a legislative contract.

While the Bank Tax cases from Ohio (16 *Howard,* 369) perhaps go as far as any in limiting the power of the legislature to amend previous legislation where the sovereign power of taxation is concerned, whatever may be thought of the force of the reasoning of the Supreme Court of Ohio as against that of the Supreme Court of the United States, in this case, still

the latter court had the right to settle it, and did so ; and so ended the controversy.

The court holding in that case that a clause in a general banking law passed in 1845, declaring that a certain per centum of profits paid by the bank, should be in lieu of all taxes to which the bank would be subject, was a contract fixing the amount of taxation, and not a law prescribing a rule of taxation until changed by the legislature, and that a law passed in 1857, taxing banks and bank stock, the same as other property in the state, so far impaired the obligation of the contract as to render it unconstitutional. In the light of these decisions, and many others that we have examined, we have no hesitation in holding that the relator had a contract for printing the laws of the last session.

It had all the elements of a contract—the agreement of two competent parties about a legal and competent subject matter, upon a mutual legal consideration, with a mutuality of obligation. (1 *Ohio St.*, 657.)

The relator was under bond for the performance of his part of the contract, and the state was pledged for the performance of its part by the law, and the authorized acts of its officers.

The relator was not the state printer. There is no such officer in the state ; he was doing certain specified work for a stipulated consideration.

The law under which the contract was made was one not only authorized but enjoined by the constitution, which directs that the public printing shall be let on contract to the lowest bidder, by such executive officers, and in such manner, as shall be prescribed by law.

It will be observed, that not only by its elements was the letting of the printing to the relator a contract in

its legal signification between the relator and the state, but by the very language of the constitution it was called, by its fit and appropriate name, a contract. The state had no power to let the printing save by contract, for such is the method prescribed by the constitution. It being, then, a contract, by its constituent elements and by constitutional provision, for printing the laws for one year, had the legislature the power to abrogate the contract? Clearly not. They had exhausted their power over the matter, and were as much bound by the result as a private individual; as much bound to keep faith as the humblest person in the state, and had, under the constitution of the United States, as little power to impair the obligation of the contract as though it had been made by the most inconsiderable citizen. The legislature was bound by a higher obligation, for it could not, with good grace, ask the citizen to keep faith and obey its enactments, at the same time that it was breaking faith and disregarding the requirements of the constitution.

We are aware that, as a general principle, our legislature is competent to repeal or modify any act which a former legislature was competent to pass, and that one legislature cannot abridge the power of a succeeding legislature. But this general principle has exceptions. When one legislature has fixed the salaries of the judiciary, it is not competent for a subsequent one to raise those salaries during the term of the incumbent. The legislative power as to that matter is exhausted. So in this case; having let the contract for a year, the power is exhausted. The object of the constitutional provision was to prevent the prostitution of the public patronage to the purposes of political favoritism. The framers of that instrument had undoubtedly observed

the uses to other states of the public printing, and attempted by this provision to prevent such use here, and put it out of the power of the legislature to control the matter, save as the public good might demand, by general laws.   How could this end be reached, if any legislature might interfere with one letting by providing for another that should supersede the first?   If they have that power, they could exhaust the patience of honest bidders, till none but their favorites would longer have the faith to compete for the work.   We have confidence that such was not the purpose of the last legislature; but we are not dealing with it as a question of intention, but as one of power, and we think, under the state constitution, the legislature had exhausted its power over its printing of the laws of the current year.

Again, when absolute rights of property have been acquired and vested by authority of law, no subsequent legislative action can divest this right.   (*Fletcher* v. *Peck*, 6 *Cranch*, 87.)   So where a contract is made under the authority of law, the right of property acquired arises not from the law itself, but from the contract to which it pertains as an incident, and the law-making power cannot divest the rights thus acquired, originating, not in the law itself, but in acts done under the law, and which attach as incidents, not to the law, but to contracts made under it.   To the argument of counsel, that a legislative body cannot divest a subsequent legislature of control over the matters, we oppose the decisions of the Supreme Court, as announced in the Bank Tax cases from Ohio, and the subsequent decisions in Ohio on the same questions. (5 *O. S.*, 45.)   There is no higher attribute of government than the right of taxation; yet we have seen that

the legislature of Ohio, in 1845, bound subsequent legislatures on this subject by making a provision that certain profits should be in lieu of all taxes. The case before us is much stronger. This is a contract that was doubtful in that case; this is not the foreclosure of the power of subsequent legislatures, but the execution of a power in the exact method enjoined by our constitution. We are therefore of the opinion that the act of the last legislature, so far as it provided for the printing of the laws by any one besides the relator, was beyond the power of that body, and therefore void.

We are not insensible of the importance of having the revised laws printed under the superintendence of the commissioners, with the advantage of the head notes and references provided for; nor do we perceive that the views we have of the case will prevent such a result. Only so much of the law of last session is invalid as violates the contract of the relator.

The rest may well have force and effect. But let that be as it may, any advantage that might be gained by a violation of public faith would be too dearly bought.

The mandamus must be awarded.

All the justices concurring.