JOHN A. MARTIN, *as Governor of the State of Kansas*, v. CHARLES K. INGHAM.—THE STATE OF KANSAS, *on the relation of George Getty, County Attorney*, v. JOHN A. MARTIN, *as Governor of the State of Kansas.* (*Original Proceeding in Mandamus.*)

1. GOVERNOR — *Duties — Control by Mandamus, or Injunction.* Where purely ministerial duties are by statute imposed upon the governor, and such duties are only such as might be devolved upon any other officer or agent, the performance of such duties may be controlled by mandamus or injunction.

2. ————— *Duties as to New Counties.* The duties imposed upon the governor by the statutes relating to the organization of new counties are partially ministerial, and partially not.

3. INJUNCTION, *When not Authorized.* Where a petition for an injunction to restrain the governor from acting upon the return and report of the census-taker in proceedings instituted for the organization of a new county alleges great fraud on the part of the census-taker and others, but does not allege that the fraud was ever brought to the attention of the governor or that he refused an investigation of the same under the statutes, such petition does not state facts sufficient to authorize an injunction.

4. MANDAMUS, *Insufficient Grounds for.* Where an alternative writ of mandamus alleges that the governor refused to act upon the return and report of the census-taker, but does not allege that no complaint of fraud or illegality was ever brought to the attention of the governor or that the delay was not for the purpose of an investigation, such writ does not allege sufficient grounds for a mandamus.

*Error from Shawnee District Court.*

TWO ACTIONS against *John A. Martin*, as governor — one by *Ingham*, to perpetually enjoin the defendant from the performance of certain acts in the organization of Grant county, and especially from declaring Ulysses the temporary county seat thereof; the other, brought in this court by *The State*, on the relation of George Getty, county attorney of Hamilton county, to compel the governor to organize the county of Kearney, to name Lakin as the temporary county seat, and appoint the necessary officers under the law. The material facts are

41 — 38 KAS.

stated in the opinion, filed at the session of the court in February, 1888.

*S. B. Bradford*, attorney general, for plaintiff in error; *E. A. Austin*, and *L. J. Webb*, of counsel.

*Waters & Chase*, and *E. F. Hilton*, for defendant in error Ingham.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought in the district court of Shawnee county, by Charles K. Ingham, a citizen, resident tax-payer and elector of the unorganized county of Grant, against John A. Martin, as governor of the state of Kansas, to perpetually enjoin the defendant from the performance of certain acts in the organization of such county. The facts, as set forth in the plaintiff's petition, are sworn to by him, and a large number of affidavits of other persons in support of such facts are filed with the petition as exhibits thereto. The petition and the exhibits show substantially, and in detail, the following facts: On or about May 9, 1887, in pursuance of the statutes for the organization of new counties, (Gen. Stat. of 1868, ch. 24, p. 249, *et seq.*; Laws of 1872, ch. 106; Comp. Laws of 1885, ch. 24, ¶¶1400 to 1412; Laws of 1886, ch. 90; Laws of 1887, ch. 128;) and upon proper preliminary proceedings had, the defendant, as governor, appointed Thomas J. Jackson as the census-taker, the register of the votes of the electors for the temporary location of the county seat, and the assessor for the said unorganized county of Grant. Immediately afterward Jackson qualified by taking the prescribed oath of office, and proceeded to Grant county, where he did certain work, and afterward, and about August 25, 1887, made his report to the governor. He went into the county of Grant in a state of intoxication, and remained there in a maudlin condition for two weeks, during which time he was incapable of doing any kind of business properly. Upon his entering into the county, he fraudulently, corruptly, and for pay, entered into an arrangement and conspiracy with certain

parties to speculate upon the temporary organization of the
county by the use of their influence and office.   Pursuant to
said arrangement, the overture was first made to persons in-
terested in the town of Cincinnati, and it being refused, it was
then made to persons interested in the town of Ulysses, and
accepted.   After this arrangement had been made, Jackson
began work.   He then moved to Ulysses.   He enumerated
the names of sixty fictitious persons, and counted them in fa-
vor of Ulysses for county seat.   He excluded a large number
of qualified voters from having their preferences recorded for
county seat.   This number was sufficiently large to materially
affect the result.   A large number of voters did vote for Cin-
cinnati for county seat, and he corruptly changed their votes,
and reported them as voting for Ulysses.   He announced the
voting closed by proclamation of the sheriff, and then took
votes by night for Ulysses.   He took and recorded a large
number of votes for Ulysses of persons who pretended to live
upon certain described lands, who did not reside there, and
whose names and habitations were unknown.   He took the
votes of a large number of other persons, and recorded them
for Ulysses, who were not voters.   A large number of voters
voting in favor of Ulysses were procured by bribery.   Frauds
of various kinds were perpetrated during the enumeration, with
his knowledge and consent.   He was, and continued to be,
drunk, indecent, and disgusting.   His examinations were car-
ried on in a lascivious and disgraceful manner.   He travestied
the oath to persons enrolled; and performed many other acts
of like nature and character as the above.   The petition of
the plaintiff also alleges as follows:

"The plaintiff further states that the defendant, John A.
Martin, governor, threatens to, and will at once consider and
act upon the said report of the census-taker, and will find there-
from that there are at least two thousand and five hundred
actual, *bona fide* inhabitants in the said unorganized county of
Grant; that five hundred of them are householders; and that
there is at least $150,000 worth of property in excess of legal
exemptions, exclusive of railroad property, of which not less
than $75,000 worth is real estate; and will appoint three per-

sons commissioners of said county, one to act as county clerk, and one to act as sheriff; and will designate and declare the town of Ulysses as the place chosen by the greater number of legal voters, to be the temporary county seat of said county of Grant, unless he shall be restrained and prohibited from so doing by the order and injunction of this court."

The plaintiff also asked for a temporary injunction. Before any hearing was had, however, the governor signed the following stipulation:

"1. I desire that the court shall thoroughly examine into all questions of fraud, partiality, drunkeness, bribery, or unfair dealings, on the part of the enumerator.

"2. I expressly waive any objection as to the capacity of the present plaintiff to bring suit, and at no stage in the proceedings shall this question be suggested by myself.

"3. I do not waive, however, my right to dispute the authority of the court to inquire into these matters.

JOHN A. MARTIN, *Defendant.*"

Afterward, and upon the foregoing petition and affidavits, and upon the plaintiff's application for a temporary injunction, a hearing was had before the judge of the district court at chambers, and upon such hearing the judge granted the temporary injunction; and to reverse this order, granting the temporary injunction, the defendant, as plaintiff in error, brings the case to this court.

It is claimed in this court, and was also claimed in the court below, that the courts of Kansas have no jurisdiction to hear and determine any case like the one at bar. Indeed, it is claimed that the courts of Kansas have no jurisdiction to hear and determine any controversy that brings into question any act or acts of any member of the executive department of the state, and in Kansas all the state officers are members of the executive department. In Kansas, as elsewhere, there are three great branches or divisions of civil power, which, with some exceptions, are to be exercised by three separate departments: the legislative or the law-making power, the judicial or the law-construing power, and the executive or the law-enforcing power. With some exceptions, the legislative power is vested

in the legislature, the judicial power is vested in the courts, and the executive power is vested in an executive department. In Kansas, under the constitution, the executive department is constituted as follows:

"SECTION 1. The executive department shall consist of a governor, lieutenant-governor, secretary of state, auditor, treasurer, attorney general, and superintendent of public instruction." ( Const., art. 1, § 1.)

The governor, however, is at the head of the executive department; for § 3, of the same article of the constitution also provides as follows:

"SECTION 3. The supreme executive power of the state shall be vested in a governor, who shall see that the laws are faithfully executed."

It is generally supposed that in a republican government all men are subject to the laws, and to the due administration of them, and that no man nor any class of men is exempt. There is no express provision in the constitution, nor in any statute, exempting any member of the executive department, chief or otherwise, from being sued in any of the courts of Kansas, or in any action coming within the jurisdiction of any particular court, civil or criminal, upon contract or upon tort, in *quo warranto, habeas corpus, mandamus*, or injunction; or from being liable to any process or writ properly issued by any court, as *subpœnas*, summonses, attachments, and other writs or process; and if any one of such officers is exempt from all kinds of suits in the courts, and from all kinds of process issued by the courts, it must be because of some hidden or occult implications of the constitution or the statutes, or from some inherent and insuperable barriers founded in the structure of the government itself, and not from the express provisions of the constitution or the statutes. So far as the present case is concerned, however, which is injunction, and another case which is also before us and which we are also considering, which is *mandamus*, it is only necessary for us to consider whether the governor, without reference to the other members of the executive department, is subject to the action of *mandamus* and

injunction, or not. But, in order to properly consider these questions, it is necessary that we should consider many other questions. It might be proper here to state that, so far as the express terms of the constitution and the statutes are concerned, the governor is no more exempt from *mandamus* or injunction than he is from any other action or proceeding in any of the courts, or than he is from any process, civil or criminal, issued by the courts.

We believe that only four cases can be found in the reports of the supreme court of Kansas in which it has been sought by a judicial determination to control any of the acts of the governor. The first was the case of *The State, ex rel., v. Charles Robinson*, governor, and the secretary of state, and the treasurer, constituting the board of state canvassers. (1 Kas. 18.) That was an application for a writ of *mandamus* to compel the board of state canvassers to canvass certain election returns. It does not appear that any question of jurisdiction was raised or thought of in that case, but the court decided the case upon its merits, and refused the writ. The second was the case of *In re Cunningham*, 14 Kas. 416, in which an application was made for a writ of *mandamus* to compel the governor, Thomas A. Osborn, to issue a patent for certain lands. It was understood at the time that the governor was willing to issue the patent if the supreme court said that it was his duty to do so, and the only question presented to the court, or decided by it was, whether such was his duty or not. The court held that it was not his duty, and refused the application. The third case was that of *The State, ex rel., v. St. John, Governor*, 21 Kas. 591. In that case an alternative writ of *mandamus* was allowed. At first the defendant's counsel filed an answer disputing the jurisdiction of the court, but afterward the governor, by his counsel, expressly waived all question of jurisdiction, and the governor himself also personally desired that the court should hear and determine the case without reference to any question of jurisdiction, stating that he would obey the decision of the court, whatever it might be. The court heard and determined the case, and

awarded a peremptory writ of *mandamus;* but no such writ was ever issued, as the governor immediately proceeded to act in accordance with the decision of the court, which rendered the writ unnecessary. The fourth case was the case of *Wilson v. Price-Raid Aud. Com.,* composed of the governor, the secretary of state, the auditor, the treasurer, and the attorney general. (31 Kas. 257.) That case was a supposed appeal from the auditing commission to the supreme court. No question of jurisdiction was raised, but the court itself, for inherent defects and want of merits in the case, dismissed the same.

There are a number of cases in which state officers other than the governor have been sued in the courts of Kansas. Two of such cases are the cases of *The State, ex rel., v. Robinson,* and others, above cited, and *Wilson v. Price-Raid Aud. Com.,* above cited. The other cases are as follows: In the case of *The State, ex rel., v. Lawrence, Secretary of State,* 3 Kas. 95, an application for a writ of *mandamus* was made to compel the defendant, as secretary of state, to issue a certificate of election to the relator. The question of the jurisdiction of the court to grant the same was raised, but the court decided in favor of its jurisdiction, and awarded a peremptory writ of *mandamus.* In the case of *The State, ex rel., v. Comm'rs of School Fund,* 4 Kas. 261, which board consisted of the state superintendent of public instruction, the secretary of state, and the attorney general, no question of jurisdiction was raised, and the court decided the case upon its merits, and refused to grant the writ of *mandamus* prayed for. In the case of *The State, ex rel., v. Barker, Secretary of State,* 4 Kas. 379, no question of jurisdiction was raised, and the court decided the case upon its merits, and awarded a peremptory writ of *mandamus* to compel the secretary of state to deliver to the relator copies of the recently enacted laws for the purpose that he might publish the same for the state. The case of *The State, ex rel., v. Barker, Secretary of State,* 4 Kas. 435, is similar to the case last cited, except that in this case it was held that the relator was not entitled to copies of the laws, and the writ of *mandamus* was refused. In the case of *The State v. Anderson, Treas.,* 5

Kas. 90, an injunction was prayed for against the state treasurer, and the case was decided upon its merits, and it was held that, upon the facts, the plaintiff was not entitled to the injunction. In the case of *Graham, Treas., v. Horton*, 6 Kas. 343, an injunction was allowed in favor of Horton and against the state treasurer. In the case of *The State, ex rel., v. Thoman, Auditor*, 10 Kas. 191, a peremptory writ of *mandamus* was allowed against the auditor. The case of *Prouty v. Stover, Lieut. Governor*, 11 Kas. 235, was tried upon its merits without any question of jurisdiction being raised, and the writ of *mandamus* prayed for was refused. The case of *Martin v. Francis, Treas.*, 13 Kas. 220, was decided upon its merits without any question being raised with respect to the jurisdiction of the court, and the writ of *mandamus* prayed for was refused. In the case of *Francis, Treas., v. A. T. & S. F. Rld. Co.*, 19 Kas. 303, an injunction was allowed by the district court against the state treasurer, and the supreme court heard the case upon its merits without reference to any question of jurisdiction, and decided that upon the facts of the case, the railroad company, which was the plaintiff below, was not entitled to such injunction. In the case of *The State, ex rel., v. Francis, Treas.*, 23 Kas. 495, a peremptory writ of *mandamus* was allowed against the treasurer. In the case of *Orans v. Francis, Treas.*, 24 Kas. 750, *mandamus* against the treasurer was in effect sustained. In the case of *The State, ex rel., v. Francis, Treas.*, 26 Kas. 724, injunction against the state treasurer was sustained. In the case of the *A. T. & S. F. Rld. Co. v. Howe, Treas.*, 32 Kas. 737, injunction against the state treasurer was also sustained.

It would seem that the question as to whether the courts of Kansas may control any of the acts of the governor, or not, is still an open one. The question, however, whether the courts of Kansas may control any of the acts of the other members of the executive department, or not, would seem from the general practice of the bench and bar, and from the actual decisions of the courts, to have been settled in the affirmative. Of course this general practice and these decisions with rela-

tion to the other members of the executive department do not necessarily control with reference to the governor, for there is some room under §§ 1 and 3 of article 1 of the constitution, above quoted, for a distinction to be made between the acts of the governor and the acts of the other members of the executive department; for while the executive department consists of the governor, lieutenant governor, secretary of state, auditor, treasurer, attorney general, and superintendent of public instruction, yet the governor is the supreme head thereof. In the other states there is a great conflict of authority as to whether any of the acts of the governor may be subject to judicial control, or not. Upon the affirmative of this question the following, among other cases, are cited: *Tenn. &c. Rld. Co. v. Moore, Governor, (mandamus,)* 36 Ala. 371; *Middleton v. Low, Governor, (mandamus,)* 30 Cal. 596; *Harpending v. Haight, Governor, (mandamus,)* 39 id. 189; *Wright, Governor, v. Nelson, (mandamus,)* 6 Ind. 496; *Baker, Governor, v. Kirk, (mandamus,)* 33 id. 517; *Gray, Governor, v. The State, (mandamus,)* 72 id. 567; *Magruder v. Swann, Governor, (mandamus,)* 25 Md. 173; *Groome, Governor, v. Gwinn, (mandamus,)* 43 id. 572; *Chamberlain v. Sibley, Governor, (mandamus,)* 4 Minn. 309; *Chumasero v. Potts, Governor, (mandamus,)* 2 Mont. 242; *Wall v. Blasdel, Governor, (mandamus,)* 4 Nev. 241; *Cotten v. Ellis, Governor, (mandamus,)* 7 Jones (N. C.) Law, 545; *The State v. Chase, Governor, (mandamus,)* 5 Ohio St. 528. A vast number of cases might be cited where the courts have held that the official acts of the members of the executive department other than the governor may be controlled by judicial determination. Upon the negative of the above question, the following cases are cited: *Hawkins v. The Governor, (mandamus,)* 1 Ark. 570; *The State, ex rel., v. Drew, Governor, (mandamus,)* 17 Fla. 67; *Low v. Towns, Governor, (mandamus,)* 8 Ga. 360; *The People, ex rel., v. Bissell, Governor, (mandamus,)* 19 Ill. 229; *The People, ex rel., v. Yates, Governor, (mandamus,)* 40 id. 126; *The People, ex rel., v. Cullom, Governor, (mandamus,)* 100 id. 472; *The State v. Warmouth, Governor, (mandamus,)* 22 La. An. 1; *Dennet, Petitioner, v. The Governor, (manda-*

*mus*,) 32 Me. 508; *The People v. The Governor*, (*mandamus*,) 29 Mich. 320; *Rice v. Austin, Governor*, (*mandamus*,) 19 Minn. 103; *Western Rld. Co. v. De Graff*, (*mandamus*,) 27 Minn. 1; *Vicksburg Rld. Co. v. Lowry, Governor*, (*mandamus*,) 61 Miss. 102; *The State v. The Governor*, (*mandamus*,) 39 Mo. 388; *The State v. Price, Governor*, (*mandamus*,) 1 Dutcher (N. J.), 331; *Hartranft's Appeal*, (contempt,) 85 Pa. St. 433; *Mauran v. Smith, Governor*, (*mandamus*,) 8 R. I. 192; *Turnpike Co. v. Brown, Governor*, (*mandamus*,) 8 Baxt. (Tenn.) 490.

There are other cases cited which hold that none of the acts of any of the officers belonging to the executive department can be controlled by the courts, among which cases are the following: *The People v. Hatch, Secretary of State*, (*mandamus*,) 33 Ill. 9; *The State, ex rel., v. Deslonde, Secretary of State*, (*mandamus*,) 27 La. An. 71; *The State, ex rel., v. Dike*, (*mandamus*,) 20 Minn. 363; *The State, ex rel., v. Whitcomb, Auditor*, (*mandamus*,) 28 id. 50; *Secombe v. Kittelson*, (injunction,) 29 id. 555; *H. T. & B. Rld. Co. v. Randolph, Treasurer*, (*mandamus*,) 24 Tex. 317; *Bledsoe, Comptroller, v. International Rld. Co.*, (*mandamus*,) 40 id. 537; *G. B. & C. N. Rly. Co. v. Gross, Comm'r*, (*mandamus*,) 47 id. 428; *Chalk v. Darden, Comptroller*, (*mandamus*,) 47 id. 438. The principal ground upon which these last-cited cases were decided, is that the officers against whom the court was asked to entertain jurisdiction were members of the executive department, the same as the governor, though not at the head as he is, and therefore that as the acts of the governor, in their opinion, could not be controlled by the courts, because he is a member of the executive department, neither can the acts of any other officer of the executive department be so controlled. This same kind of reasoning, however, is used by the supreme court of California to prove that the acts of the governor in some instances may be controlled by the courts. (*Harpending v. Haight, Governor*, 39 Cal. 189.) In this case it is said in substance, that if it be conceded that the governor, because he is the *chief* of the executive department, may for that reason be allowed to enjoy an absolute immunity from all judicial

process, even when his duty in the given instance is only ministerial, and in a case where a citizen has a vested right to have such duty performed, then the same exemption from judicial process may be set up by any one of the other officers of the executive department; but it is held in that case that the other members of the executive department could not effectively interpose any such exemption, and therefore that the governor could not. It would therefore seem from two classes of decisions, that the courts must hold, either that the courts may control some of the official acts of all the members of the executive department, including the governor, or that they cannot control any of the official acts of any one of such officers. In this state it has already been held that some of the official acts of some of the members of the executive department may be controlled by the courts, and therefore, if the above reasoning is sound, it would follow that some of the official acts of the governor might also be controlled by the courts. It would be proper here to say, that no court ever attempts, by either injunction or *mandamus*, or by any other action or proceeding, to control legislative, judicial, executive, or political discretion; and never indeed attempts to control any purely legislative, judicial, or executive act of any kind, nor pure discretion of any kind, except when a superior court on appeal reviews a decision of an inferior court; and courts do not generally interfere by injunction or *mandamus* where another plain and adequate remedy exists. The only acts of public functionaries which the courts ever attempt to control by either injunction or *mandamus*, are such acts only as are in their nature strictly ministerial; and a ministerial act is one which a public officer or agent is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed. Hence many of the above-cited cases wherein it is said that the acts of executive officers of the state could not in the particular instance under consideration be controlled by the

courts, are not in conflict with those decisions which hold otherwise; for many of such cases were decided upon the theory that the court was asked to control executive or political action, or discretion of some kind.   If we should deduct all the cases decided upon the theory that the court was asked to control executive, political, or discretionary action, and not consider any of the *dicta* of such cases, and thereby leave only such cases as necessarily included a *decision*, (not *dictum*,) and *decided* that the courts could not in any case control any act to be performed by the governor, the weight of judicial authority would probably be that the courts may control any mere ministerial act to be performed by the governor.

The decisions holding that the courts cannot control any of the acts of the governor are based upon many different kinds of reasons.   Some of such decisions, like the one in the case of *Hawkins v. The Governor*, 5 Ark. 570, and the one in the case of *The State v. Price, Governor*, 1 Dutcher (N. J.), 331, are based upon the theory that all duties imposed upon the governor by the *constitution* are strictly and exclusively executive or political, and not ministerial, and therefore that the courts cannot interfere with the performance or non-performance by the governor of such duties.   There are other decisions, like the one in the case of *Turnpike Co. v. Brown*, 8 Baxt. (Tenn.) 490, and the one in the case of *The State, ex rel., v. Drew, Governor*, 17 Fla. 67, which extend this principle, and hold that all duties imposed upon the governor by either the constitution or the statutes must necessarily be executive or political, and not merely ministerial; and this upon the theory that the mere act of conferring duties upon the governor, whatever their inherent natures or essences may be, renders them executive or political.   It is said that when they are conferred upon the governor instead of upon some inferior officer, they are so conferred because, in the opinion of the law-making power, founded presumptively upon sufficient reasons, the duties themselves, properly and peculiarly, if not necessarily, belong to the executive department, and that they are conferred upon the governor because of his superior judgment, discretion,

sense of responsibility, and fitness; and therefore it is claimed that these duties must necessarily be executive or political, and not merely ministerial, whatever they may be in the r inherent and essential characteristics. If this were true when the duties are conferred upon the chief of the executive department, why would it not also be true when such duties are conferred upon any other member of the executive department? Is not any particular power substantially the same wherever it may be placed? Judicial power in the hands of a justice of the peace is substantially the same as it is when placed in the hands of a supreme court. It may be admitted, however, that with respect to some duties, and even with respect to some ministerial duties, a transformation might take place if such duties were transferred from an inferior officer and placed in the hands of the highest executive officer; for some ministerial duties embody within their confines slight elements of judgment and discretion; but can this be true with respect to all ministerial duties? Suppose that such duties in their very natures and essences are nothing more than the purest of ministerial duties, with no elements of judgment or discretion in them, and not in any manner connected with any legislative, judicial, or executive duty, and are such duties only as could be conferred upon any other citizen of the state of Kansas : then why should they be considered as being transformed into executive or political duties by being conferred upon the governor? Would they not still be ministerial duties? The conferring of pure ministerial duties like the above mentioned upon the courts or the judges of courts, never transforms them into judicial duties; and although *mandamus* will not lie to review or control judicial determination or discretion, yet it will lie to control any pure ministerial act of the courts or the judges thereof. (*Duffitt v. Crozier, Judge,* 30 Kas. 150; High Ex. Rem., § 230, *et seq.*) Many years ago, Chief Justice Marshall, in the case of *Marbury v. Madison,* 1 Cranch, 64, said:

"It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the pro-

priety or impropriety of issuing a *mandamus* is to be determined."

And such is the rule in all cases, unless the courts are required to make an exception in favor of the governor. In all other cases it is not the rank or character of the individual officer, but the nature of the thing to be done, which governs. No other officer is above the law; and every other officer, to whatever department he may belong, may be compelled to perform a purely ministerial duty. The objection oftenest urged against the court's exercising control over any of the acts of the governor is, that the three departments of government, the legislative, the judicial, and the executive, are separate and distinct, and that each is equal to, coördinate with, and wholly independent of, the other. Now it is true, with some exceptions, that the legislature cannot exercise judicial or executive power, that the courts cannot exercise legislative or executive power, and that the executive department cannot exercise legislative or judicial power; but it is not true that they are entirely separate from each other or independent of each other, or that one of them may not in some instances control one of the others. The most of the jurisdiction possessed by the courts depends entirely upon the acts of the legislature, and the entire procedure of the courts, civil and criminal, is prescribed by the legislature. Nearly all the duties of the governor are imposed upon him by the legislature. The legislature may also impeach the governor, or any other state or judicial officer mentioned in the constitution. The courts may construe all the acts of the legislature, whether such acts have been signed by the governor or not, and may determine whether they are in contravention of the constitution or not, and if believed to be in contravention of the constitution, may hold them void. The courts may also determine that a supposed member of the legislature is not a member at all, because he represents no district; and may also determine that the legislature cannot consist of more than a certain number of members. (*Prouty v. Stover, Lieut. Governor*, 11 Kas. 235; *The State, ex rel., v. Tomlinson*, 20 id. 692; *The State, ex rel., v.*

*Francis, Treas.*, 26 id. 724.) The courts may also pass upon the validity of the acts of the governor. (*The State v. Ford County*, 12 Kas. 441.) It is also believed that the courts have the power to require the governor to attend a trial as a witness; and if so, then have they not the further power to imprison him for contempt if he disobeys? And if so, would not the courts then interfere with his ability to perform his executive duties? In such a case the state might have to rely upon the lieutenant governor. No act of the legislature can become a law unless it is presented to the governor for his signature and approval. The governor may also convene the legislature whenever he chooses. Also, the legislature and the courts are able to perform their respective duties unmolested, because of the known power of the governor to call out the militia to aid and protect them in doing so, if necessary. It will be seen from the foregoing that the different departments of the government are not independent of each other. The power last mentioned, however, is also invoked as an argument against the court's attempting to control any act or acts of the governor. It is said that if the governor opposes the order or judgment of the court, it cannot be enforced; for it is said that he has the entire control of the militia. But are the courts to anticipate that the governor may not perform his duties? Should not the courts rather presume that when a controversy is determined by the courts — the only tribunals authorized by the constitution or the statutes to construe the laws, and to determine controversies by way of judicial determination — the governor, as the chief executive officer of the state, would see that such determination should be carried into full effect? Such would be his duty, and no one should suppose that he would fail to perform his duty, when his duty made manifest by a judicial determination of the courts. No department should ever cease to perform its functions for fear that some other department might render its acts nugatory, or for fear that its acts might in some manner affect the conduct or status of some other department. Each department ought to do what is right within its own sphere, and presume that

the other departments will do the same.   The legislature is
not bound to refrain from passing laws affecting the duties
of the executive department, whether the governor approves
them or not.   The legislature may pass laws over the gov-
ernor's veto, and this for the government of the executive de-
partment; and the legislature is not bound to anticipate that
the governor might refuse to enforce such laws.   Each de-
partment should scrupulously perform the duties peculiarly
intrusted to its own department, without reference to how the
same might affect the other departments.   Besides, if this
argument from the governor's control of the militia were car-
ried to its full extent, it would prevent any court from ever
issuing any *subpœna* or any other writ or process to the gov-
ernor, or from ever arresting him or ordering his arrest for any
assault and battery, or *for anything else*, because the governor
might in any such case refuse to obey the writ or the order of
the court, and might call on the militia to assist him in his
resistance.

Perhaps we should say something further with respect to
the claim that the three great branches of the government,
the legislative, the judicial, and the executive, are coëqual and
coördinate, and that one cannot control or direct the others.
This may be true to so        xtent, and yet, as we have already
seen, it is not true in many cases.   For the purpose of pass-
ing laws the legislature is supreme, and *the other departments
must obey*.   For the purpose of construing the laws, and of
determining controversies, the courts are supreme, and *the other
departments must obey*.   And for the purpose of ultimately
enforcing the laws the executive department is supreme, and
*he other departments must obey*.   But the executive depart-
ment can enforce the statutory laws only as the legislature
has enacted them, and where the courts have construed the
laws (statutory or constitutional) in the determination of con-
troversies, the executive department can enforce them only as
thus construed, and is bound to see that the laws as thus con-
strued, and the judgments and orders of the courts rendered
or made in the determination of controversies, are respected

and obeyed. And will not the executive department do it? Will it refuse in any instance? It will thus be seen that while each of the different departments of the government is superior to the others in some respects, yet that each is inferior to the others in other respects; and it is always difficult to compare things which are wholly unlike each other, or to call them equal. Each department in its own sphere is supreme. But each outside of its own sphere is weak and must obey. It will be readily admitted that the courts cannot control any executive act of the governor, or any executive power conferred upon him. But may they not control ministerial power wherever placed? Is not ministerial power always inferior to judicial power, and subject to judicial control? The recipient of ministerial power exercises no judgment, no discretion, but is simply bound to obey the law under a given state of facts; and to construe this law and to ascertain these facts are peculiarly within the province of the courts. If an applicant for relief on the ground of the refusal to exercise or the wrongful exercise of ministerial power by the governor has no remedy in the courts, then he has no remedy at all. The remedy of impeachment, and the remedy of subsequent elections, suggested by some of the courts, may be a remedy to the public in general, but it cannot be a remedy to an individual sufferer for injuries or loss in person or to his property. In the case of *Marbury v. Madison,* 1 Cranch, 58, Chief Justice Marshall uses the following language:

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection."

And further on in the same case, page 61, after stating that the courts cannot control executive discretion, the great chief justice uses the following language:

"But when the legislature proceeds to impose on that officer [the secretary of state of the United States] other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the perform-

ance of those acts, he is, so far, the officer of the law; is amenable to the laws for his conduct, and cannot at his discretion sport away the vested rights of others."

In the case of the *Tenn. &c. Rld. Co. v. Moore*, 36 Ala. 382, the following language is used:

"All this is but the result of the just and wholesome principle that no public functionary, whatever his official rank, is above the law, or will be permitted to violate its express command with impunity. While, therefore, it is true that, in regard to many of the duties which belong to his office the governor has, from the very nature of the authority, a discretion which the courts cannot control, yet, in reference to mere *ministerial* duties imposed upon him by statute, which might have been devolved on another officer if the legislature had seen fit, and on the performance of which some specific private right depends, he may be made amenable to the compulsory process of the proper court by *mandamus.*"

In the case of *Ferguson v. Earl of Kinnoull*, 9 Clark & Fin. 290, Lord Brougham uses the following language: "But where the law neither confers judicial power nor any discretion at all, but requires certain things to be done, every body, whatever be *its* name, and whatever other functions of a judicial or of a discretionary nature it may have, is bound to obey." Of course we should always presume that the governor intends to do his duty, but he may be mistaken as to the law, or he may not be sufficiently advised as to the facts upon which the applicant for relief founds his right thereto, and there is no way prescribed by law by which issues can be made up and tried before the governor as issues are made up and tried before the courts. The courts are created for the express purpose of trying controversies, while the other departments and ministerial officers are not.

It is also claimed that if the courts may control the ministerial acts of the governor, and may also determine which are ministerial acts and which not, then that the courts may determine everything, and obtain complete control over the entire executive department, including the governor. It must be remembered, however, that all controversies must be determined somewhere, and that the courts are the only tribunals

created by the constitution and the laws for the special purpose of construing the constitution and the laws, and of determining controversies between parties, and the power to determine whether a given power is a purely ministerial power, or not, and whether an applicant for relief in any particular case has a right to such relief under the law creating such power, or not, comes particularly within the province of the courts. And a determination in such a case is purely judicial, and is one of the things for which courts were created, and they could not refuse their aid in such cases without so far wholly abandoning their duties and abdicating their jurisdiction.

As to the question whether the courts may control the ministerial acts of the governor, many of the cases cited for the purpose of showing that they cannot, are not applicable, for no such question was involved in the facts of such cases. For instance: In the case of the *Vicksburg Rld. Co. v. Lowry, Governor*, 61 Miss. 102, a writ of *mandamus* was prayed for only as against the state treasurer, and no relief of any kind was sought as against the governor. In the case of *Low v. Towns, Governor*, 8 Ga. 372, the following language is used:

"If, as has already been remarked, it was competent for the legislature to impose this ministerial duty of issuing a commission to a clerk, on the executive officer of the government, wholly independent of, and in addition to, the other functions devolved upon that officer by the constitution, why may he not, when the performance of this ministerial act, so required by law, is *essential* to the completion and enjoyment of individual rights, be considered, *quoad hoc*, not as an *executive*, but as a merely ministerial officer, and therefore liable to be directed and compelled to perform the act by *mandamus?* Viewed as strictly a *legal* question, we cannot offer any satisfactory reason why he should not, according to the general principles of the law."

The writ of *mandamus* asked for in that case was refused because of the want of necessary facts to entitle the relator to it. In the case of *The People v. The Governor*, 29 Mich. 320, 322, 324, an application was made for a writ of *mandamus* to compel the governor to issue a certain certificate *when he should*

*be satisfied* that certain work had been done in conformity with the law. In that case the following language is used in the opinion of the court:

"If we concede that cases may be pointed out in which it is manifest that the governor is left to no discretion, the present is certainly not among them, for here, by the law, he is required to judge, on a personal inspection of the work, and must give his certificate on his own judgment, and. not on that of any other person, officer, or department."

In the case of *Hartranft's Appeal*, 85 Pa. St. 433, it was sought to compel the governor to disclose state secrets belonging only to the political department of the government. In the case of *The State v. Price, Governor*, 1 Dutcher ( N. J.), 331, 343, 344, 348, a writ of *mandamus* was asked for to compel the governor to issue a commission to the relator, but there was no showing made that the relator had ever demanded such commission, or that the governor had ever refused the same, and the court held "that the applicant, upon the facts disclosed, is not entitled to the relief sought for," and also held that the court was "asked to direct the commission to be issued in direct conflict with the plain requirements of the act," which of course could not be done. In the case of *Mauran v. Smith, Governor*, 8 R. I. 192, 222, it was rightly held that whether the court had jurisdiction over any act of the governor, or not, still that, upon the facts of that case, the relator was not entitled to the relief sought. These cases are given merely as illustrations of the inapplicability of many of the cases cited to show that the courts have no jurisdiction to control a ministerial act to be performed by the governor. On the other side, what is said in the case of *Chamberlain v. Sibley*, 4 Minn. 309, as to the power of the courts to control ministerial acts of the governor, is only *dictum*. Upon the whole, however, if all the cases cited, except such as necessarily included the question whether the courts may in any case control the ministerial acts of the governor, be excluded, and if only such cases as include the above question be considered, then not only reason, but the weight of authority, we think,

will be found in favor of the affirmative of the question. And certainly as to all the executive officers except the governor, the great weight of authority, state and federal, is in favor of the theory that ministerial acts to be performed by an executive officer may be controlled by the judiciary. If we are correct in our conclusions, then we have jurisdiction to hear and determine the present case upon its merits. We have jurisdiction to determine whether the acts of the governor sought to be controlled in the present instance are ministerial acts, or acts of some other kind or character; and we have jurisdiction to determine whether the facts of the present case authorize the relief sought.

We are really, however, considering two cases. The first presents to us the question whether the judge of the district court at chambers erred or not in granting a preliminary or temporary injunction, an injunction *pendente lite.* The other case is *mandamus,* brought originally in this court, and it is submitted to us upon a motion to quash the alternative writ; and the question presented is whether the alternative writ states facts sufficient to constitute a cause of action in *mandamus,* and within the jurisdiction of this court. It will therefore be seen that after deciding that we have jurisdiction of such cases, any further decision in either case will only be a decision of a preliminary or interlocutory character. After deciding that we have jurisdiction, then the remaining questions to be determined are whether the acts of the governor, in the organization of new counties, are ministerial, or not, and whether the facts stated in either case are sufficient to authorize the relief sought. In the case of *The State, ex rel., v. Comm'rs of Ford Co.,* 12 Kas. 441, 445, decided at the January term of this court in 1874, it was held that the acts of the governor in the organization of new counties, under the statutes as they then existed, were ministerial. Since that time the statutes have been materially changed in several particulars. The following provisions are new, and they are now in force:

"SEC. 3. That whenever the governor may have any reason

to believe that said memorial, affidavits, in the census enumeration or petition, or any of the proceedings required in section one of this act, are incorrect, fraudulent, or untrue, he is authorized and required to delay or refuse to issue his proclamation, and to institute an investigation by sending three disinterested householders of this state into such unorganized county, to ascertain the truth or falsity of such petition, memorial, census, or affidavits, and to order the attorney general to commence proceedings in the name of the state against any person or persons who may be guilty of violating any of the provisions of this act, or of any and all persons who may conspire together to fraudulently organize any county under this act." (Laws of 1876, ch. 63, § 3; Comp. Laws of 1885, ¶ 1402.)

"The census-taker shall register upon said duplicate schedules opposite the name of each legal voter his election for temporary location of county seat, which shall be taken by the governor as the definite expression of said voter, *unless there shall be evidence before him that said list has been tampered with and changed.*" (Laws of 1887, ch. 128, § 1.)

Now, while many of the duties imposed upon the governor in the organization of new counties, and possibly all of them except certain ones prescribed by the new provisions above quoted, are still ministerial, yet some of those duties prescribed by these new provisions are certainly not ministerial. Some of them relate to the investigation of supposed frauds, and precisely that kind of frauds which we are now asked to investigate in the injunction case; and clearly such duties are not ministerial. Hence, as some of the duties imposed upon the governor in the organization of new counties are ministerial and some of them not, and as the courts will not by *mandamus* or injunction control any of the acts of officers except such as are purely ministerial, and will not control even them when any other plain and adequate remedy exists, it follows that it must be shown clearly and conclusively in the particular case, that the acts of the governor sought to be controlled are not only purely ministerial acts, but also that no other plain and adequate remedy exists. Also, as we have already stated, all presumptions are in favor of the good faith and honesty of the governor. It will not only be presumed that

he has in the past performed honestly and faithfully all his duties, but it will also be presumed that he will in the future honestly and faithfully perform the same; and these presumptions will continue until it is clearly, conclusively and affirmatively shown otherwise; and in favor of the chief executive officer of the state these presumptions should be considered as of the strongest character, indeed much stronger than any kindred presumptions in favor of inferior officers. These new provisions will not only affect the action of the governor in many cases, but may also affect the action of the courts in particular cases. Whenever, in the organization of new counties, the governor delays to act upon the return or report of the census-taker, it must be presumed that some complaint or notice of fraud or illegality has been brought to the attention of the governor, and that he delays action for the purpose that an investigation may be had; and the courts should not by *mandamus* or otherwise require the governor to act until it is affirmatively alleged and shown that no sufficient reason exists for such delay. No allegation of this kind is to be found in the alternative writ of *mandamus*, in the present *mandamus* case, and hence the alternative writ is defective and insufficient. Also, when the governor is about to act upon the return or report of the census-taker, it must be presumed that no complaint or notice of fraud or other illegality worthy of attention has been brought to the attention of the governor; and before the courts should attempt to restrain the governor from acting upon such return or report, it should be affirmatively alleged and shown that a complaint of fraud or other illegality worthy of notice had been actually brought to the attention of the governor, and that he then disregarded and ignored such complaint. Also, as a general rule, all persons, in cases of fraud or other illegality in the organization of new counties, have a plain and adequate remedy by resorting to the investigation provided for in said § 3, above quoted. If complaints of fraud or illegality have been made, an investigation may be had at once under that section, and in the investigation that ensues, all parties

4. Mandamus; defective writ.

have a plain and adequate remedy. In the present *mandamus* case no allegation is made that no complaints of fraud or illegality were brought to the attention of the governor, or that the governor is not delaying for the purpose that an investigation may be had; hence for this reason the alternative writ is insufficient. In the injunction case, no allegation is made that any fraud or illegality or even irregularity of any kind has ever been brought to the attention of the governor, or that he would fail to regard the same if it were brought to his attention; hence the petition for the injunction is

3. Injunction, insufficient petition for.

insufficient for that reason. If the fraud and other irregularities alleged in the petition in the injunction case had been brought to the attention of the governor, and he asked to inaugurate an investigation of the same under said §3, he would undoubtedly have done so. At least it must be so presumed in the absence of allegations and proof to the contrary. Before parties can resort to the courts for a *mandamus* or an injunction, they must exhaust their other remedies, provided their other remedies are plain and adequate. This the plaintiffs in the two cases which we are now considering have failed to do. They have wholly ignored a plain and adequate remedy.

The motion to quash the alternative writ of *mandamus* will be sustained, and the order of the judge of the court below granting a temporary injunction will be reversed.

All the Justices concurring.